BARING assignee of CUTTING *against* SHIPPEN.

*Philadelphia,*
*Tuesday,*
December 26.

IN ERROR.

The assignor of a bond is a competent witness to prove that it was fraudulently obtained by him, or that it was given to raise money for the obligor, and that he used it to pay his own debt.

The plea of " layman and " unlettered" &c., is not necessary in *Pennsylvania.* Fraud either in the execution or the consideration of a bond may be given in evidence under the plea of payment.

UPON error to the Circuit Court of *Bucks* county the case was thus:

On the second of *November* 1798 the defendant signed a bond and warrant of attorney for the payment of six thousand dollars to *John Browne Cutting*, who on the 15th *November* assigned it under his hand and seal in the presence of two witnesses, to *Baring* the plaintiff; and on the 2d *July* 1800 judgment was confessed in the Common Pleas of *Bucks* county. On the 2d *May* 1801 the defendant moved the court to stay proceedings, upon an affidavit which stated, that at the time she signed the bond and warrant, she was not indebted in any sum whatever to *Cutting*, nor did she

know at that time nor for a long time afterwards, that she had signed and executed such instruments; but that they had been obtained by the fraud and artifice of *Cutting* as a power of attorney and duplicate, to enable him as her agent to transact some business at *Antigua*. The court thereupon made an order to stay proceedings on the judgment, and that the defendant should be at liberty, under an issue to be formed between the parties, to shew want of consideration or fraud in the execution of the bond, and that the jury impanelled in the cause should decide whether any thing and how much was due. The cause was then removed by consent to the Circuit Court, where an issue was formed upon the plea of *payment*, with leave to give the special matter in evidence.

While the cause was pending in the Common Pleas, a rule was entered for a commission to examine witnesses in *Antigua;* but the defendant having obtained *Cutting's* answer to a bill in chancery, it was agreed by the plaintiff's attorney, that, excepting a certain letter therein contained from *Cutting* to *Manley*, the answer might be read in evidence as if regularly taken under a commission, subject to all legal exceptions at the trial.

Accordingly upon the trial of the cause in *May* 1803 before the late Chief Justice *Shippen* and Mr. Justice *Brackenridge*, the defendant offered in evidence the answer of *Cutting*, which in effect was as follows:

He admitted the execution of the bond on the 2d *November* 1798, at which time he believed the complainant (Mrs. *Shippen*) was indebted to him about three hundred and fifty dollars for disbursements or engagements on her account. That he commenced his agency in her affairs sometime in *September* 1798, when he possessed her entire confidence; and that in *October* following she informed him that she was in pecuniary distress, and that she had occasion for actual supplies in her ordinary expenditure, and also to carry on her affairs relative to her landed property. That he suggested to her whether money might not be raised by her note or bond; but she seemed to think otherwise; upon which he mentioned to her the opinions of several gentlemen of the law, and among others of Mr. *Dallas*, and he produced an opinion of that gentleman and was proceeding to read it, and

to place before her the real state of her affairs, when she interrupted him by saying she gave him unlimited authority to act for her as he would for an only sister, *and that whatever papers he thought necessary to carry on his agency, she would execute.* That conceiving from these expressions that she had left the mode of raising money for her use entirely to his discretion, he got a blank printed bond and filled up the blanks with the sums before mentioned, and also procured two letters of attorney to be drawn to authorize him to act in her various affairs. That the bond and letters of attorney were executed by her at her house near *Bristol* in *Pennsylvania*, in the morning of the 2d *November* 1798; and that when he produced the bond and letter of attorney to her, it was in the presence of four persons, two of whom signed as witnesses. *That he requested her to peruse the same*, and that the papers remained on a table in her library several hours before they were executed. He denied that he told the complainant that the bond was a duplicate or counterpart of a letter of attorney; but he admitted that he did not inform her of the nature of the bond or letter of attorney; and after they were executed, *he desired her to read them, but she refused, and told him to act for her as for his only sister, without adverting to any opinion or perusals on her part.* He admitted also, that on the 15th *November* 1798 he assigned the bond to *Alexander Baring* to countersecure the sum of 2470 dollars, for which he had just before given *Baring* a promissory note. That in *March* or *April* 1798 he drew a bill of exchange upon his brother in *Hamburgh* for 2000 dollars in favour of *Baring*, which was returned protested in *November*, when he was called upon by *Baring* for principal &c. amounting to 2470 dollars; and he gave him his promissory note for the sum payable in *May* 1799, and the assignment before mentioned as a security. *That he never had any conversation with Mr. Baring either before, at, or after the assignment, touching or concerning the manner of obtaining the said bond from the complainant.* That at the time he obtained the bond, he had no intent to defraud the complainant, but merely to raise money upon the same for her use, which he unsuccessfully attempted to raise; and that when he made the assignment he entertained hopes and well grounded expectations of paying *Baring* his demand at

the time stipulated in the note, which he really intended to pay. That on or about the 10th *September* 1799 he wrote and sent a letter to *John C. Manley* merchant in *Charleston S. C.* his attorney, in the following words. [This letter was excepted in the plaintiff's agreement.] He admitted that the complainant arrived in *Antigua* about the time mentioned in her bill of complaint, and that he had a conversation with her in which she severely reproached him for his conduct in obtaining and assigning the bond, and he did not contradict any thing said by her. That on the day following, he and *H. B. Lightfoot* esquire met the complainant at her lodgings, *where she asked him whether she owed him any money on the said* 2d *of November* 1798, *and that he answered* " *no,*" not at that time recollecting what moneys he had expended on her account; and that *she also asked him whether he had not assured her that the said bond was the counterpart of a letter of attorney, and that he did not to such question answer in the affirmative or negative.* That the said *Lightfoot* did propose that he should execute a release to the complainant, to which he assented; and that he did then and afterwards in another conversation held with the defendant, declare that he never meant to exact 6000 dollars from her, that he had erred in not informing her of the assignment, that he had endeavoured to make reparation, and that it was owing to the death of *Manley* his attorney, and his own absence from the *United States*, that *Baring's* debt remained unpaid, and the bond uncancelled.

To this evidence the plaintiff's counsel objected. But after argument the court overruled the objection, and signed a bill of exceptions, which, after setting forth in the usual form the evidence which the defendant had produced to maintain the issue on her part, stated the plaintiff's exception in the following manner: " To which evidence the coun-
" sel for the plaintiff objected, and did insist that the *several*
" *matters and things* contained in the said answer were inad-
" missible, and by the rules of law ought not to be admitted
" in evidence on the part of the defendant, who, at the time
" of giving the said bond *was, and still is, a person learned in*
" *the English language, and capable of reading and under-*
" *standing the same in writing and in print,* and also because
" the said *John Browne Cutting*, to whom the said bond had

1809.

BARING
*v.*
SHIPPEN.

" been made, and who had assigned the same to the plaintiff,
" *was not a competent witness for the purpose aforesaid;* and
" prayed the court that they would not permit the *said several*
" *matters and things* to be given in evidence to maintain the
" said issue on the part of the defendant. Nevertheless the
" court were of opinion that the said several matters and
" things were proper &c."

   *Hare* for the plaintiff argued upon two general exceptions
to the evidence. 1. That *Cutting* the assignor was not a com-
petent witness to defeat the bond. 2. That the matters con-
tained in his answer were not competent testimony under
the issue that was tried, or under the circumstances of the
case.

   1. *Nemo allegans suam turpitudinem audiendus est,* is a
maxim as old as the civil law; and it has been enforced as a
rule of evidence in common law courts, by some of the ablest
judges in *England.* This, together with a rule of law found-
ed on public policy, disqualified *Cutting,* who not only pro-
ved his own fraud, but had signed the instrument he was
called to defeat. " No party," says Lord *Mansfield,* " who
" has signed a paper or deed, shall ever be permitted to give
" testimony to invalidate it." *Walton* v. *Shelley* (a). The
same doctrine was adopted in *Hart* v. *M'Intosh* (b), and in
*Phetheon* v. *Whitmore* (c). Lord *Kenyon's* leaning it is
known was the other way. He shewed it first in *Bent* v.
*Baker* (d), where he took the distinction between negotiable
and other paper, and allowed the application of the rule to
instruments of the former kind. In *Adams* v. *Lingard* (e) he
denied it altogether, and adhered to that opinion in *Jordaine*
v. *Lashbrooke* (f). In this last case, where for the first time
*Walton* v. *Shelley* was formally denied, it is to be remarked
that *Ashhurst* decidedly adhered to the opinion he pro-
nounced in that case, and stated the principle of the deter-
mination to be, that no person is a competent witness to im-
peach a security which he himself has given a sanction to;
that both *Grose* and *Lawrence,* who agreed in admitting the
witness, relied mainly upon the importance of such testimony
where the public revenue was concerned, and appeared to
take that as a distinction; and that the rule laid down by

(a) 1 *D. & E.* 300.    (c) *Peake's N. P.* 40.    (e) *Peake's N. P.* 117.
(b) 1 *Esp.* 298.    (d) 3 *D. & E.* 35.    (f) 7 *D. & E.* 601.

*Lord Kenyon* himself is obviously too narrow, and would cut off some of the best established principles of the law of evidence. He understands the rule to be that, " where a " witness is infamous and his record of conviction is produ- " ced, or where he is interested in the event of a cause, he " cannot be received; but to carry the rule beyond that, " would be extending it farther than policy, morality, or the " interests of the public require." In this rule there is no exception for the case of husband and wife, none for the case of a witness who comes to prove bastardy after the death of the parents, or to disprove a marriage after thirty years' cohabitation; nor is there any for the case of instrumentary witnesses, whose competency to give evidence against their attestation he indeed affirms, although Lord *Mansfield* and the whole court of King's Bench ruled otherwise in *Goodtitle* v. *Clayton* (*a*), and ordered a new trial because they had been admitted. The principle of *Walton* v. *Shelley* has however been recognized in *New-York*, in the case of *Baker* v. *Arnold* (*b*), and in this state in the cases of *Stille* v. *Lynch* (*c*) and *The Commonwealth* v. *Ross* (*d*); and it is not now to be questioned before this court. But to prevent its effect upon this cause, it will be said that it is confined to negotiable paper. Now there is nothing like such a distinction in the terms of the rule laid down by Lord *Mansfield,* nor is there any reason for the limitation. Public policy is the foundation of the rule; the policy of protecting securities against the fraud of a party who has at one time asserted their validity, by giving them currency; and many of the most important securities in commercial use, policies of insurance, bills of sale &c. are not negotiable. In *Pennsylvania* particularly, there should be no distinction in this respect between a bond and a note. They are put upon the same footing by the act of 1715. 1 *St. Laws* 107. Both the legal and equitable interest in a bond pass by an assignment under seal before two witnesses; and an instrument assignable in this manner is negotiable. To apply the rule to a stock contract, which was held to be negotiable in *Reed* v. *Ingraham* (*e*) or to a bill of lading, *Lickbarrow* v. *Mason* (*f*) and not to such a

(*a*) 4 *Burr.* 2224.
(*b*) 1 *Caines* 260.
(*c*) 2 *Dall.* 194.

(*d*) 2 *Dall.* 239.
(*e*) 3 *Dall.* 505.
(*f*) 2 *D. & E.* 71.

bond, is to create a distinction where there is no difference. In *Davis* v. *Cammel* (a) and in *Cook* v. *Ambrose* (b) it was in fact applied to a bond.

2. The evidence was not competent in itself. It was intended to shew that the defendant had signed the bond, when she meant to sign a letter of attorney; but she was desired to read it, and refused; and in such a case she is bound by it, though penned against her meaning. *Throughgood's case* (c), *Pigot's case* (d), *Moore* 184. *Skinn.* 159. 2 *Freem.* 194. Her only remedy was to plead that she was unlettered and could not read, and so conclude that it was not her deed. The evidence was not competent even as an equitable defence, for it shewed that she was imposed upon through her own fault, which destroyed her equity. *Osmond* v. *Fitzroy* (e). At law therefore the evidence was improper upon the plea of payment, and it was bad in equity, because it shewed that she had none, and that the plaintiff had both the equity and the law.

*Lewis* on the same side cited *Charrington* v. *Milner* (f), and *Humphrey* v. *Moxon* (g) where Lord *Kenyon* said the courts had laid down a rule that a man should not destroy his own security; and *Lekeux* v. *Nash* (h) and *Humberton* v. *Howgil* (i) to prove that the fraud could not be shewn under the plea of payment. He said also that he should make another point, that the conversations between *Cutting* and the defendant at *Antigua*, set forth in the answer, were clearly inadmissible, and that the judgment must be reversed for that if for no other cause.

*Hopkinson* for the defendant insisted that the argument should be confined to the two exceptions taken at the trial, that *Cutting* was not a competent witness, and that the defendant should have pleaded " not lettered" &c.; the bill of exceptions stating these only, and all other exceptions having been waived by the plaintiff's attorney below, and by Mr. *Lewis* himself.

(a) *Addison* 233.         (d) 11 *Co.* 27.           (g) *Peake's N. P.* 52.
(b) *Addison* 323.         (e) 3 *P. Wms.* 130.      (h) 2 *Stra.* 1221.
(c) 2 *Co.* 9 b.           (f) *Peake's N. P.* 6.     (i) *Hob.* 72.

This being denied by Mr. *Lewis*, the court directed affidavits to the point; and at a subsequent day Mr. *Hopkinson* produced his own affidavit and that of Mr. *Tilghman* his colleague on the trial, and a letter from Mr. *Ewing* the plaintiff's attorney dated the 17th *October* 1807. At the same time he cited the following cases to shew that an agreement between the counsel below is binding in error, and that the plaintiff could not take an exception which he had omitted at the trial, and did not state in his bill. *Russel* v. *Union Insurance Company* (a). *Johnson* v. *Chaffant* (b). 3 *Bl. Comm.* 372. *Tidd's Prac.* 314. Mr. *Lewis* on the other hand produced his affidavit, denying an agreement to waive any particular exception; and he insisted that his exception at the trial, and the bill before this court, were comprehensive enough to include every thing, being to all and every part of the evidence, and that he was not bound to be more explicit.

On this part of the argument, it is unnecessary to say any thing further, as it is very fully detailed in the opinion of Judge *Yeates*. On the two principal points,

*Hopkinson* and *Tilghman* for the defendant argued in the *first* place, that *Cutting* was a competent witness, and that a common law case to the contrary was not to be found either in *England* or *America*. *Walton* v. *Shelley* was the first case in which a judicial sanction was given to the principle, that a witness, without being either infamous or interested, was incompetent, if his testimony impeached an instrument which he had signed. In scarcely an instance has the decision been noticed without this remark; and in many subsequent cases the proposition has been denied altogether, while in every one it has been limited to precisely the same case as *Walton* v. *Shelley*, a case of *negotiable* paper. As early as Queen *Ann's* time, a witness who had conveyed lands, was allowed to prove that he had no title; *Title* v. *Grevett* (a); which is in direct collision with the broad rule laid down by Lord *Mansfield;* and the same principle was recognized not only in *Jordaine* v. *Lashbrooke*, but in *Balliot's Lessee* v. *Bow-*

1809.

BARING
v.
SHIPPEN.

(a) 4 *Dall.* 421.  (b) 1 *Binn.* 75.  (c) *Ld. Ray.* 1008.

1809.

BARING
v.
SHIPPEN.

man (a) decided at the *Northampton* Circuit in *May* 1802 by Chief Justice *Shippen* and Judge *Smith*, and in *Hurst's Lessee* v. *Lowder* at Nisi Prius in *March* 1803 before the same Judges and Judge *Brackenridge*, where the grantor of an estate was examined to defeat the defendant's title derived from him. So in *Lowe* v. *Jolliffe* (b) the attesting witnesses to a will were permitted to give evidence against it. Lord *Mansfield* had a strong leaning to the civil law; he was educated in it; and he was desirous to ingraft its principles upon the law of *England*. The maxim upon which he relies, is disregarded every day in the case of accomplices, who are never rejected for incompetency; and, excepting Justice *Ashhurst* who joined with him in the original decision, there has not been a judge in *England* since his time, who has not disavowed the rule. In *Bent* v. *Baker*, *Buckland* v. *Tankard* (c) and *Jordaine* v. *Lashbrooke*, its propriety, even in relation to negotiable paper, was drawn in question; but Mr. *Hare's* cases shew that it has never been carried further than this; and what is decisive in the present instance, the Supreme Court of this state held, in the case of *Pleasants* v. *Pember-*

---

(a) BALLIOT's Lessee v. BOWMAN.

The defendant made title under a warrant to *Christopher* and *Jacob Seyberling*, and a deed poll from *Jacob* to *Christopher*, and from *Christopher* to defendant.

By the plaintiff's evidence it appeared that *Christopher* and *Jacob Seyberling* had come into possession of the premises under the title by which the plaintiff claimed, and afterwards took out a warrant for the same land to raise a new title in themselves, and to cut out the other.

To explain this transaction, and to remove the imputation of fraud from it, *Jacob Seyberling* was called as a witness.

*Sitgreaves* objected to his competency, 1. Upon the ground of interest; but this was obviated by a release. 2. Because he could not be a witness to support his own title.

PER CURIAM. If the witness is disinterested in the event, we cannot see the force of the objection. It has been ruled that a man may be a witness to prove he had no title to land which he conveyed; 2 *Ld. Ray.* 1008. and the same principle has been recognized in a late case. 7 *D. & E.* 601. If a man may be a witness to impeach, why may he not to sustain a title made by him, provided he is not interested in the event? The question turns exclusively on the point of interest; and courts of late, lean strongly against objections to the competency of witnesses.

(b) 1 *W. Black.* 365.                    (c) 5 *D. & E.* 579.

*ion* (*a*), that the general expression in *Walton* v. *Shelley* must be limited as it was explained in *Bent* v. *Baker*, that is, to *negotiable* instruments. In the cases from *Addison* the witness was rejected because his parol testimony was offered to alter the bond. The only question then is, whether a bond in *Pennsylvania* is a negotiable instrument. Before the act of 27th *February* 1797, 4 *St. Laws* 102, there was no negotiable instrument in *Pennsylvania* but a bill of exchange. That act gave this character to notes of a certain description, but to nothing else. If there is no defence by either payer or indorsor, except what appears on the note, then it is negotiable; but if it is liable in the hands of every one to the discount, and objections of the payer, then it is assignable merely; and this is beyond all doubt the situation of a bond. The rule in fact has no reason except in reference to instruments of the former kind, the currency of which it is important to free from every restraint. In the other cases it is not only conformable to law, but to policy, to exclude no witnesses but such as are infamous by conviction, or interested in the event of the cause.

In the *second* place, whatever may be the law of *England*, it is settled law in this state, that fraud and want of consideration may be given in evidence under the plea of *payment*, whether lettered or unlettered. It is a practice introduced to supply the place of a court of Chancery. *Swift* v. *Hawkins* (*b*), *Hollingsworth* v. *Ogle* (*c*). It is regulated by an express rule of this Court, requiring notice, which was accordingly given to the plaintiff; *Rule* 39. *Sup. Cur.;* and it was part of the order of the Common Pleas in the present case, that such evidence might be given. The defendant's imprudence, her want of equity, and the case of the plaintiff with all its merits, were for the consideration of the jury; they could not in any degree affect the competency of the evidence.

*Lewis* in reply, said that he was not disposed to controvert the rule in *Title* v. *Grevett*, which had been adopted in this state; but it was a severe rule which merited no extension, and it was no authority for permitting a witness to de-

(*a*) 2 *Dall.* 197.     (*b*) 1 *Dall.* 17.     (*c*) 1 *Dall.* 260.

feat his own assignment. The title to real estate is a matter resting upon documents which every one may examine for himself; the validity of a bond may be affected by facts which attend its execution, and the assignor engages by his assignment that none such exist. To permit him after this engagement to give evidence of his own fraud in overthrow of the bond, is to open a door for combinations to commit fraud; and it is as correct a rule of evidence to exclude a witness who would thus testify to his own infamy, as a witness against whom a record of conviction is produced. The case of *Lowe* v. *Jolliffe* is also very different from this. The witnesses by their attestation did not declare the validity of the will, but the fact of sealing and publication; and they swore that the testator was *non compos*. They however were not objected to, and in the later case of *Goodtitle* v. *Clayton*, it appears that an objection to their competency would have been allowed. The decisions before *Walton* v. *Shelley* therefore do not contradict Lord *Mansfield*'s rule; and Lord *Kenyon*, who first denied it, and led the opposite opinion, has been so inconsistent with himself in the cases from *Peake* 6. 40. 52. 107, that he ought not to have the weight of a feather against such men as Lord *Mansfield*, *Yeates*, and *Buller*. The rule has certainly been recognized here in its broadest terms; for in *Stille* v. *Lynch* this Court said that the witness was not competent, as he was offered *to invalidate his own instrument:* and in *Pleasants* v. *Pemberton* what was said by the Chief Justice as to *Walton* v. *Shelley* was a *dictum*, for he decides that the witness did not come to contradict the writing or any thing that was in it. Whether an instrument shall be negotiable, depends upon the will of the parties. A stock contract, and a bill of lading have been so considered. A policy of insurance is not. It is not assignable in its terms; and when it is transferred, nothing but an equity passes. But a bond is as negotiable as a bill of lading. The act of assembly prohibits the assignor from releasing the debt, intending that neither interest nor power shall remain in him, and that all shall go to the assignee.

The rule of Court and the decisions upon giving fraud in evidence under the plea of payment, are not denied; but they are confined to fraud in the consideration, and not in the execution of the bond. In the latter case the only answer to

the bond is, that the party was incapable of reading, and that the bond was misread, and then it results that it was not her deed.

But at all events the conversations at *Antigua*, long after the bond was assigned, ought not to have gone to the jury, and for this reason certainly the judgment should be reversed.

*Cur. adv. vult.*

TILGHMAN C. J. I shall consider this cause under three points of view.

1. Was any part of *Cutting's* answer evidence?

2. Was there any part of it which was *not* evidence?

3. If there were parts not evidence, have any circumstances arisen, which preclude the plaintiff from the benefit of his exceptions?

1. Several objections have been made to the answer of *Cutting in toto*. First, it is said, that he was an incompetent witness, because he had assigned the bond which his testimony tends to invalidate. It is not pretended that he was interested in supporting the defendant's plea. On the contrary, if he had any interest, it would have been promoted by the plaintiff's recovery. By the principles of the common law, every person not interested, and not of infamous character, may be a witness. This principle was first broken in upon in the case of *Walton* v. *Shelley*, where from motives of policy it was decided that a man should not be allowed to invalidate an instrument to which he had given credit, by signing his name. The rule thus broadly laid down, has since been denied in *England*, particularly in the case of *Jordan* v. *Lashbrooke*, 7 *D. & E.* 601. But what is much more to the purpose, the rule was confined to *negotiable instruments* by a decision of this Court, in *Pleasants* v. *Pemberton*, 2 *Dall.* 196. and the law has since been considered as settled. But it is contended, that granting the law to be so restricted, still *Cutting* was incompetent, because a bond is a negotiable instrument, being assignable by an act of assembly. But though assignable, I do not consider it as coming within the mercantile idea of a negotiable instrument, because it is liable in the hands of the assignee to every plea discount and objection, which might have been offered by the obligor against the obligee. As to that kind of negotiable paper (such as

bills of exchange &c.) which passes by indorsement, and is held by the indorsee, not subject to any right of discount existing between the original parties, there may be great public convenience in the rule which prevents any one from impeaching by his testimony the writing to which he has given credit by his name; but there is no such necessity in case of bonds, where every assignee knows that he takes the paper liable to objections. It never has been decided, that the assignee of a bond is an incompetent witness; and as it is not quite clear to me, that courts have a right to set aside principles of law from motives of policy, I am not for extending the rule farther than it has been already carried. Next it has been urged, that *Cutting's* testimony was altogether improper, because Mrs. *Shippen* could read, and ought to have examined the bond before she executed it. If issue had been joined on the plea of *non est factum* in *England*, this, in a court of common law, might have been a good objection. But the parties stand in our courts, on a different footing. By a rule of Court, matters that shew fraud or want of consideration, may be given in evidence under the plea of payment, notice being given to the adverse party. In this case notice was given. Now who can say that the answer of *Cutting* is not material to prove fraud? It tends to prove that a bond, which was given by Mrs. *Shippen* to him, for the sole purpose of raising money *for her use*, was applied by him to the purpose not of raising money at all, but of *paying a debt of his own*. If Mr. *Baring* had applied to Mrs. *Shippen* before he took the assignment, (which in prudence he ought to have done) he would have found at once that *Cutting* was acting a fraudulent part, and the mischief would have been prevented; not having done so, he took the assignment at his peril, and has no right to complain of the defence set up against him.

2. But are there no parts of the answer which were not legal evidence? Undoubtedly there are. I think that has not been denied by the defendant's counsel; indeed it could not have been denied with any hope of success. The answer contains conversations between Mrs. *Shippen* and *Cutting* in *Antigua*, long after he made the assignment, which certainly are not evidence against *Baring*. The plaintiff has excepted to all and every part of this answer. It is true, consent had

been given, that the answer should be read; but it was subject to all legal objections, and it is perfectly understood that this reservation gives the right to object to particular parts as well as the whole, and this is every day's practice. This brings me to the third point.

3. Is there any thing to preclude the plaintiff from the benefit of his bill of exceptions in its full extent? It is said that there is. Affidavits have been read, to prove that it was understood at the trial that no objections were to be made in this Court, but those which went to the answer of *Cutting* in *toto*. To these affidavits of the defendant's counsel, a counter affidavit has been filed by the counsel for the plaintiff. But no agreement appears upon the record; and sitting here in a court of error, I do not think myself at liberty to go out of the record in order to form a decision on facts which are disputed. If it was confessed that such an agreement had been made, means might be found to do justice. But under the present circumstances, I am afraid of setting a precedent which may be attended with dangerous consequences. Confining myself to the record, I must say that the plaintiff's exception has been supported. At the same time I cannot help adding, that it may tend to obstruct the administration of substantial justice, if at the trial of a cause, objections are brought forward and urged, which go to the whole of a deposition, while others are kept back, (though included under general expressions in the bill of exceptions) which are good as to particular parts, and those perhaps not very material. It takes the adverse counsel by surprize, who in many instances would strike out the objectionable parts as soon as they were pointed out; and it keeps the court in ignorance, who may have their judgment reversed on a point on which they gave no opinion, and which was not even submitted to their consideration. I think it my duty therefore to express my hope, that in future, when objections are intended to be made against particular parts, they will be brought forward, and distinctly stated in the bill of exceptions.

On the whole it is my opinion that the judgment of the Circuit Court be reversed, and a *venire facias de novo* awarded.

1809.

BARING
v.
SHIPPEN.

YEATES J. On the fullest reflection, I am of opinion, as well upon general principles and the rule of this Court, as upon the terms under which the proceedings upon the judgment entered in this action, were stayed on the 2d *May* 1801, that the *general* matters contained in the answer or deposition of *John Browne Cutting*, might well be given in evidence under the plea of payment, with notice of the special matters. They tended to avoid the bond, by shewing that it was made use of for a very different purpose, from that for which the deed was executed by the defendant. It is clearly settled that an obligation in the hands of an assignee, is subject to all the equity which could have prevailed against the original obligee. The circumstance of Mrs. *Shippen* not being unlettered, forms in my idea no difference. I am further of opinion, that *Cutting* was a competent witness to establish the several facts within his own knowledge previous to the assignment. The cases cited by the defendant's counsel, in my apprehension abundantly prove both positions. I will not enter into a detail of them, but will content myself with observing that the rule, that a party shall not be permitted to give evidence to invalidate an instrument which he has signed, has been confined by a decision of this Court to negotiable instruments, in *Pleasants* v. *Pemberton, January* term 1793. 2 *Dallas* 196. The only difficulty which strikes me in the case is, whether suffering the conversations, inserted in the deposition, which took place between *Cutting* and the defendant at *Antigua* in 1801, to go to the jury, was error or not, under all the circumstances of the case.

I agree that sitting as a court of error, we are confined to matter of law arising upon the face of the proceedings; so that no evidence is required to substantiate or support them. 3 *Bla. Com.* 405. The rule laid down is, that the plaintiff in error is confined to the objections taken at the trial, and stated on the face of the bill of exceptions; and was so decided in the house of lords in a case of *Rowe* v. *Power* on a bill of exceptions from *Ireland.* 2 *New Rep.* 36. and cited in *Kensington* v. *Ingles et al.* 8 *East* 281. And I also agree that the evidence excepted to was inadmissible on abstract principles, because the conversations alluded to happened more than two years after *Cutting* had assigned the bond to the plaintiff, and therefore were in truth, *res inter alios acta.*

Whether such facts exist in this case, of which the court can legally take judicial notice, as would prevent the plaintiff from taking advantage of this error, is a question which necessarily demands consideration. It led during the argument to a very unpleasant discussion, which the court greatly regretted. If there were no decisions on the subject, it would be just and reasonable, that the act of the attorney should bind the client; but the law is clearly so settled. 1 *Salk.* 86. *Carth.* 412. 1 *Dall.* 164. A writ of error cannot be taken out against the agreement of the attorney. 1 *H. Bla.* 21. 2 *T. R.* 183. The court will order a *non pros.* to be entered when the writ of error has issued; 1 *T. R.* 388. and where a defendant undertook in a cause at law not to bring a writ of error for delay, or to file a bill in equity for an injunction, and he afterwards filed a bill in chancery for a discovery, the Master of the Rolls said, that although the agreement was not a good plea to the bill for a discovery, yet he would not suffer him after such an agreement to come for an injunction. 4 *Bro. Cha. Rep.* 499. And so far have the agreements of counsel been carried in this court, that in *December* term 1803, where the plaintiff's declaration below was materially defective, we gave leave to amend after a writ of error brought, without costs, upon a certificate of the adverse counsel that he had assented to such amendment previous to the trial in the court below. 1 *Binn.* 75. *Johnson* v. *Chaffant.*

The bill of exceptions states that on the trial on the 17th *May* 1803, the defendant's counsel offered in evidence the answer of *John Browne Cutting*, *prout* agreement of the plaintiff's counsel, which is in these words, as it appears on the record in the form of a letter dated *May* 26, 1801, from *John Ewing* attorney for the plaintiff to *Joseph Hopkinson* attorney for defendant. " Sir, upon reflection, I think it pro- " per to give you this early information, that *that part* of *J.* " *B. Cutting's* answer to the bill filed in *Antigua* by Mrs. " *Shippen*, which is said to be the copy of a letter from *Cut-* " *ting* to *Manley*, will be objected to by me at the trial as " inadmissible. The *other parts of the answer may be read,* " *subject to all legal exceptions*, at the trial of *Baring* v. *Ship-* " *pen.*" The plaintiff's counsel objected thereto, " that the said " *several matters and things* contained in the said answer

" were inadmissible. That the defendant at the time of giv-
" ing the bond and warrant, was and still is a person learned
" in the *English* language, and capable of reading and un-
" derstanding the same, both in writing and in print; and
" also that the said  *ohn Browne Cutting* was not a compe-
" tent witness for the purpose aforesaid, and that the said
" answer ought not to be admitted or given in evidence to
" prove the said *several matters and things* &c. But the said
" Justices delivered their opinion, that the said *several*
" *matters and things* so offered to be given in  vidence, and
" proved by the defendant to maintain the said issue on her
" part, were proper to be given in evidence and proved on
" the part of the defendant, and that the said *John Browne*
" *Cutting* was a competent witness to prove the same, and
" ordered directed and permitted the answer of the said
" *John Browne Cutting* to be read to the jury. Where-
" upon &c."

It is obvious that besides the general objection, two speci-
fic objections are here taken to the testimony offered. The
first to the nature of the testimony, on the ground that Mrs.
*Shippen* was not unlettered. The second to the competency
of *Cutting* as a witness, on the ground of his invalidating
the bond which he had previously assigned for a valuable
.consideration. I think it cannot be denied that the words
made use of, " the said several matters and things contained
" in the said answer," are sufficiently large to meet the
present exception, independently of the contents of Mr.
*Ewing's* letter before stated; but to that letter I can give but
.one construction. I read it thus. " The letter in the answer
" from *Cutting* to *Manley* is now expressly objected to, and
" you have hereby notice of it; but the other parts of the an-
" swer may be read, saving such objections as may be made
" thereto on the trial."

Under this letter, thus specially penned, I feel myself
thoroughly at liberty to take judicial notice of what passed
upon the trial, that the most perfect good faith may be pre-
served between the counsel. I well know the usual practice
on trials, when a deposition has been ruled to be received in
.evidence on argument, and the adverse counsel excepts to
particular parts thereof, that the court desire such counsel
to note the passages excepted to, which they will decide on if

the counsel cannot agree the matters between themselves. And I have no hesitation in saying, that it was incumbent on the plaintiff's counsel here to state their exceptions *specially*, to such parts of *Cutting's* answer as they deemed objectionable. It has not even been insinuated that such part of the answer as is now objected to, was specifically excepted to upon the trial, or that the judges gave any opinion thereon. What then actually took place at the time of the trial? Mr. *John Ewing*, one of the plaintiff's counsel, states in his letter of the 17th *October* 1807 to Mr. *Hopkinson*, " that to the best " of his recollection, the general question as to the admissi- " bility of *Cutting's* evidence, was only discussed; but after " the opinion of the court was given against the plaintiff, " Mr. *Lewis* stated that certain parts of *Cutting's* answer " clearly ought not to be admitted, and he thought particu- " larly alluded to *Manley's* letter. The court after some con- " versation agreed to adjourn, and requested the counsel in " the mean while to look over the answer together, as they " might possibly agree upon the parts which were admissible. " He recollected perfectly well that Mr. *Hopkinson* and him- " self read over the answer together in the tavern, and " thought it most probable that Mr. *Lewis* and Mr. *Tilgh- " man* were consulted upon the subject. The letter of Mr. " *Manley* was cut out, either by Mr. *Hopkinson* or himself. " He did not recollect any objection being afterwards made " as to the admissibility of any part of the answer, which " was not erased by them during the adjournment."

It cannot be denied, that the affidavits of the different counsel cannot be reconciled; though we cannot do otherwise than presume that each of the gentlemen in his affidavit speaks most *conscientiously*, according to the best of his knowledge, recollection and belief. Yet I am impelled to make the observation, that though both the defendant's counsel positively state, " that Mr. *Lewis* for the plaintiff and " Mr. *E. Tilghman* for the defendant were present in the " room after the adjournment of the court, and were occa- " sionally consulted by the two other gentlemen who were " examining the answer of *Cutting* in pursuance of the re- " quisition of the court," in which particulars they are corroborated by the foregoing letter of Mr. *Ewing*, Mr. *Lewis* asserts, that " he is well satisfied that the examination with

" respect to the letter, and any references thereto which might
" be contained in the answer, took place in a great measure,
" if not altogether, between Mr. *Ewing* and the opposite
" counsel or one of them; and that it related to the letter
" only, as he has always understood, except so far as it might
" be referred to by the answer." He further says, " that
" after the decision of the court, he does not recollect or
" believe that any discussion, examination or inquiry, took
" place between him and the opposite counsel or either of
" them, with respect to any or what part or parts of *Cutting's*
" answer was proper or improper to be given in evidence;
" nor does he recollect or believe that after the decision, he
" ever proposed to them or either of them, that any part or
" parts of it should be struck out." Though Mr. *Lewis* may
neither have assented nor dissented to the proposal of the
court 'in the forenoon, " to examine the deposition of *Cut-*
" *ting*, and agree to such parts as they should mutually agree
" upon to be admissible," it is most certain from Mr. *Ewing's*
second letter, that he acquiesced therein and acted in pur-
suance thereof. And though Mr. *Lewis* is sure and posi-
tive, that he never did in any way or manner, consent or
agree, either directly or indirectly, that any part or parts of
*Cutting's* answer was to be considered as evidence, or that
the bill of exceptions should be limited or confined to any
part thereof, still both he and his client must be bound by
the true meaning and fair construction of the letter of Mr.
*Ewing* the attorney upon record, of the 26th *May* 1801.

I consider Mr. *Ewing's* letter of the 17th *October* 1807 as
a safe ground, whereon I can form my judgment in the
present instance. It materially agrees with the affidavits of
the adverse counsel; and it also accords with the notes taken
upon the trial by the late Chief Justice *Shippen*, as far as
they go. Viewing the discussion in this light, I am con-
strained to believe that the *general* nature of the testimony
disclosed in *Cutting's* answer, and his competency as a wit-
ness, were the sole matters on which the court decided; and
that it was submitted by them to the counsel on both sides,
to point out and ascertain the different passages in the an-
swer wherein they agreed, which would at once shew wherein
they disagreed; that some parts of the answer were in con-
sequence hereof, erased therefrom by mutual consent; that

no objections were afterwards made to other parts of the answer, but the same went to the jury as it then stood; and that the counsel on both sides made such remarks to the jury thereon as they thought proper. It follows from hence in my idea, that the plaintiff in error cannot take advantage of the objectionable parts now insisted upon, or assign them for error under all the circumstances of the case.

Upon the whole my opinion is, that the judgment of the Circuit Court for the defendant be affirmed.

The court being thus divided in opinion,

Judgment affirmed.