Hornblower, C. J.
Two questions were raised and very fully discussed on the argument:
I. Was Woodruff a competent witness to prove the facts offered to be proved by him?
II. Were the facts offered to be proved, material to the issue?
Upon this latter question, no opinion was intimated at the Circuit; but if this court shall be of opinion that Woodruff was a competent witness, there will be no use of sending the cause back to the Circuit, if the matter offered in evidence, was immaterial to the issue. It may therefore become necessary to examine both points: and,
I. Was Wm. B. Woodruff a competent witness?
He was offered to prove two things: 1, That he obtained the note at a discount exceeding the legal rate i f interest: and 2, That in doing so, he acted as agent for the plaintiff, and had no personal interest in the transaction. °
After admitting, for the sake of the argument, the general proposition to be true, that an indorser cannot be a witness, upon the score of commercial policy, to discredit an instrument, which he has indorsed, the counsel for the defendant, ably and ingeniously contended, that Woodruff was competent to prove, that he was not an indorser for valuable consideration; that he never owned the note; that it was discounted with the plaintiffs money; that the witness acted only as his agent; and that the note actually belonged to the plaintiff, without any indorsement by the witness. The counsel further insisted, that the case was not within the rule laid down in Walton v. Shelley, 1 T. R. 296, because the witness was not offeréd to impeach the note, as void in its creation, but only to impair the plaintiff’s title to it. That if in point of fact, he acted only as the agent of the plaintiff, in *195 making the negotiation for the note, all the prior parties had an interest in his testimony, of which he could not deprive them by unnecessarily indorsing his name upon the instrument. That to carry the doctrine of Walton v. Shelley, so far as to exclude this evidence, would overturn all the cases which distinguish between admitting a party to negotiable paper, to prove the instrument void in its creation; and admitting such party to prove some matter going only to impair the plaintiff’s right to recover upon it, though a lawful and valid instrument as between other parties. Not only so, but that it would afford an impenetrable shield and protection to usurers and fraud doers, by getting upon the instrument, the name of the only witness who could disclose the true history of the transaction. That such consequences would follow, is certainly true: and it is equally true, that both in England prior to the case of Jourdaine v. Lashbrooke, 7 T. R. 601; and in several of the courts in this country, in which the doctrine of Walton v. Shelley has prevailed; a distinction has been made between admitting an indorser to prove the instrument, originally corrupt and void; and admitting him, simply, to prove, some matter, not inconsistent with the validity of the note, but going only to impair the plaintiff’s right to recover on it.
Those decisions however, so far at least, as they admit an indorser to prove any matter, not consistent with the fairness and honesty of his own indorsement; or which goes to lessen the value of the instrument as negotiable paper, prior to, or at the time he indorsed it, are not consistent with the doctrine of Walton v. Shelley: they are at war with that case, and have grown out of a disposition to quarrel with it. Any attempt to reconcile them with the doctrine of Walton v. Shelley, must fail. If commercial security, or public policy, forbids that a man who has indorsed, and thereby given credit to a negotiable instrument, should be admitted to impeach it, in the hands of a subsequent holder, as originally void, it must equally prohibit him from being a witness to prove, any matter tending to impair the value of the instrument, at the time he indorsed it. So in this case; if the indorser may first swear himself clear of his indorsement, that he was only a nominal indorser and a mere agent for the plaintiff, he would then be competent to prove any thing; as competent to prove that the note was void in its creation, as that it *196 lias become so since. So; if an indorser is a competent witness’ to prove, that the note had been paid before lie indorsed it; or that it was then over-due, and liable to set-offs, I see not, why, upon principles of commercial policy, be is not equally competent to prove, it never was worth any thing.
We must come back then, to the great question, whether arcindorser- or other party to a note is a competent witness to prove-any matter, going to show, that at the time he indorsed, the note> or became a party to it, it was of less force and value, than it purported-to be, on its face? That he is so, both upon principle and authority, I have no doubt. I had my attention called to this-subject, when I was of counsel in the case of Gardner adsm. Roosevelt, (Penn. Rep. 791.) The result of my examinations-then satisfied me, that neither the rules of evidence, the interest of commerce, the safety of the public, nor the cause of truth and justice, required an adherence, to the doctrine of Walton v. Shelley. I have always considered the decision of this court in Roosevelt v. Gardner, as settling the law in this state; because, that decision was in direct opposition to the principles upon which Walton v. Shelley, was- decided. It is true, Mr. Justice Pennington with whom Justice Rossell fully concurred, did not in-terms, declare the case of Walton v. Shelley, not to be law; but lie expressed a decided disapprobation of that case; and was in favor of admitting, the testimony of Alley the indorser; thereby in effect overturning the doctrine of Walton v. Shelley.
Alley was offered to prove two matters; 1, That the transaction between him and Roosevelt, was usurious: 2, That nothing was due on the note, and that he so informed Roosevelt at the-time. Now both of these matters went to destroy the value of the note in the hands of Roosevelt, and were inconsistent with the fairness and honesty of the indorser: they both tended to defeat and invalidate the instrument which the witness had given-credit to, by his indorsement — yet a majority of the court admitted the witness, to prove that there was nothing due upon the note when he indorsed it and that he so informed Roosevelt at the time. Now Í would seriously ask, if public policy forbids an Indorser to destroy the note he has put in circulation, by proving usurious, why does it not equally forbid, him to destroy it, by *197 proving that it was a satisfied note, and that he told his indorsee at the time of making the indorsement, that it was so. In either ease his testimony goes to discredit a note, he himself has indorsed, and to contradict the contracts between him and his indor ;ee: forty indorsing the note, he impliedly covenants, that it is an fnas-;ble note, and the money honestly due upon it. For my part, 3 can see no difference.
It is true, Chief Justice Kirkpatrick dissented from the majority of the court, in Roosevelt v. Gardner: and no man is more ready to defer to his opinions, than I am, when they have been the residí of his deliberate consideration. But if the reporter has done him justice, every reader must be satisfied, that the Chief Justice did not give the question that serious attention, its importance demanded. He put his dissent both upon the ground of interest, and of public policy. But the interest of the witness, was only an interest in the question, which long before that time had been repudiated, as a ground of objection; as may be seen by the clear and unanswerable arguments of Justice Ford, in this court, in the case of Henarie v. Maxwell, (5 Halst. 297,) and of Justice Drake in the same case, (6 Halst. 99.) It is remarkable too, that the Chief Justice should have said, that, “ Alley was swearing the note back into his own hands.” This Alley could not do. If by his testimony lie protected Gardner, he remained liable to Roosevelt, and could never regain the note, but by paying Roosevelt the money borrowed upon it. And then, upon the point of policy, the Chief Justice said, “it had frequently been adjudged by the ablest Judges, that ever sat in Westminster Hall, that the indorser cannot be a witness to avoid the note.” But instead of frequent adjudications to that effect in England, the labors and research of counsel, have failed to produce a single case prior to tiiatof Walton v. Shelley, (1 T. R. 296,) which was decided in 1786: nor any since that period, except some decisions at Nisi Prius, in which the case of Walton v, Shelley was reluctantly followed: while on the contrary, the doctrines of that case, were denied, condemned and quarrelled with, by judges and lawyers at Westminster Hall, from the time they were first promulgated, until they were finally and entirely overruled in 1798, by the case of Jourdaine v. Lashbrooke, (7 T. R. 601.)
*198 If however, the question is still an open one in this state, I an> prepared, so far as my opinion will go, to put it at rest. In doing so, I do not propose to go into an argument upon the policy of the rule laid down by Lord Mansfield and his associates, in Walton v. Shelley. So much has been said and written upon that question, and its impolicy and injustice so fully and eloquently shown by Judges in England, and by many very eminent Jurists in this country, and especially by the courts of Virginia, and New York, that I shall content myself with making a few remarks that lie on the surface of the subject, and',
í, The case of Walton v. Shelley, was decided-in 2Y86'. It is therefore no authority in this court, nor entitled to any more deference from us, than the case of Jourdaine v. Lashbrooke, by which it was overruled. Both decisions must stand upon their own merits; except so far as one or the other of them shall be found to be in conformity with decisions prior to the year 1776:
But, 2, The case of Walton v. Shelley, was the first in which-the rule contended for; was ever promulgated. Mr. Justice Pennington, in Roosevelt v. Gardner, says, the court of King’s Bench assumed if to be a principle of law; and he speaks correctly. Lord Kenyon in Jourdaine v. Lashbrooke, (7 D. & E. 603,) said, he had found no case prior to Walton v. Shelley, in which such a doctrine had been established. Grose, Justice, said,, that before the case of Walton v. Shelley, he never read of such a ground of incompetence: and Lawrence, Justice, said, that it was admitted on the argument of that'case, that no such determination was to be found prior to that time.
S. Th edoctrine laid down by the court, in Walton v. Shelley, wag l¿í direct contradiction to pre-existing rules of evidence, at the common law.
It is true, Lord Mansfield says, there is <ca rule of law, founded on public policy, that no party who has signed a paper or deed, shall ever be permitted to give testimony to invalidate that instrument:55 and similar language, tlumgh somewhat varied in form, was used by the associate justices. But where shall we look for such a rule? Not one of the judges referred to a single authority in support of it. On the contrary, and the fact is not a little extraordinary, Mr. Justice Willes, in that very case,, mentioned with approbation, an instance in which-, one of two a&» *199 signors of a ship, had been admitted by him, to prove that he had no title to the vessel at the time when he signed the deed; and that, that decision had been sustained by the court of Common Pleas. And long before the year one thousand seven hundred and eighty-six, we know, that witnesses, both in civil and criminal cases, had been permitted to disclose their own turpitude; and even to destroy deeds and wills, which they had given credit to, by their attesting them as witnesses. (See the case of Title v. Grevett, 2 Lord Raym. 1008, in which, a man was admitted in the face of his own deed, to swear that he had no title; and see also the cases cited by the court in 7 D. and E. 601, &c.) How often, let me ask, have witnesses been permitted in our own courts, to disprove, when under oath, what they have at other times asserted to be true? and that too, in cases, where persons acting upon the faith of their representations, have beenexposed by such evidence, to great prejudice?
4. The doctrine contended for, is unjust, impolitic and immoral. It holds out a premium to fraud, and encourages men in recklessly dealing with negotiable paper, without regard to its origin, or the character of the parties to the instrument. The franduleni holder of a note, or the holder of a note fraudulently procured, has only to get upon it the name of the witness to the transaction, and ho may bid defiance to truth and justice. In short, the effect of the rule is, to prevent a man however penitent for his crime, from undoing the mischief he designed. If he has obtained a note fraudulently, or without consideration, and indorsed it to his guilty co-adjutor, he is not permitted to disclose the truth, but must sit by, and see, it may be the very contriver of the fraud, reap the fruits of his iniquity.
5. ft seems to me, to border on the ridiculous, to urge in support of the rule, in JV%w Jersey, the policy of protecting commercial pape?, when in .England, the most commercial country in the old world, and the state of New York, the most commercial state in this, the case of Walton v. Shelley has been overruled, and the doctrine sought to be established by it, completely put down.
We are an agricultural and manufacturing state; and I am far from thinking that it is desirable to encourage the use and circulation among our farmers and mechanics, of mercantile paper. *200 Let it be understood that a man must “take heed to his assurance, at his peril,” that he must know' from'whom he takes it, and satisfyhimself by proper enquiries, as to its history and fairness; and if, as Mr. Justice Grose said, in Jourdaine v. Lashbrooke, “this decision will make men more cautious and prudent in dealing with securities of this sort, it will be of use.”
6. I cannot avoid noticing the palpable contradiction and absurdity, involved in the rule as laid down in Walton v. Shelley. The language of the court is, that no man shall be permitted to invalidate his own acts; and upon this principle, a witness, uninterested in the event of the suit, is to be injected, because his name happens to bp on the paper. And yet, the defendant himself, who made, or endorsed the note on which he is sued, may successfully impeach the instrument on the record, by setting up usury, or a gaming consideration.
7. The rule in Walton v. Shelley, has never been adopted in this state. We are now called upon to do so, for the first time. For the. reasons already assigned, and for those given by the court, in Jourdaine v. Lashbrooke, and by the several courts in this country that have followed the doctrines of that case; I am opposed to the rule, and think u'e have no right to adopt it, and that we ought not to do so, if we had the power.
II. Were the facts offered to be proved, material to the issue?
The answer to this question depends upon the solution of two other questions, viz:
1. Is it usury for a person to take-a transfer of a note, by a general endorsement, thereby holding the endorser liable, as such, 'upon a discount of the instrument, at a premium, greater than the legal rate of interest? And:
2. Does such a transaction, if usurious, constitute any bar to a recovery on the note, by the person thus acquiring it, or by any person claiming through him, in an action against any prior party to the instrument?,
It was admitted on the argument, that if a note is made, for the purpose of raising money upon it, at a greater premium than the legal rate of interest, or for the purpose of borrowing money upon it, the transaction will be usurious, if tire endorsee retains more than the legal interest for the time the note has to run. But it is insisted, that a business note, one that is valid and ef *201 factual against the maker, in the hands of the payee, (as was the case with the note in question) may he transferred by the holder, by his general endorsement, thereby making himself liable, as endorser, at any sacrifice he may choose to make; and that such transaction will not be usurious; but, the endorsee may recover the full amount against any prior party; although in an action against his immediate endorser, he shall recover only the sum actually advanced, with interest.
In support of this doctrine, we are referred to a course of decisions in the state of New York, afHl to the case of Nichols v. Pearson in the Supreme Court of the United States, (7 Peters, 108.) Those decisions, though entitled to our respectful consideration, are not binding on us, any farther than they themselves are sustained by authority and principles.
But, upon looking into the New York cases which were cited, and which I shall hereafter refer to by name, it appears that the Nisi Prius case of Wissen v. Roberts, reported in 1 Esp. Cas. 261, lies at their very foundation.
I think I shall be justified in this remark, when it shall be seen, that the courts of that state have constantly referred themselves to tiiat case, as sustaining their decisions, and have never cited in their support, any older or better authority from the English courts. I must therefore be permitted to examine that case with some minuteness. It is as follows; Roberts the defendant, drew a billon Yates in favor of Ould, for eighly-six pounds, which was accepted by Yates for the accommodation of Roberts, but Ifissen the plaintiff, gave only twenty-nine pounds for it, and knew when lie did so, that Yates was only an accommodation acceptor. (As between Roberts, the drawer, and Ould, the payee, it may have been, and probably was, a fair business transaction. Whether it was so or not, does not appear by the report of the case.) Lord Kenyon said, “where a bill is drawn for money really due from the drawee to the drawer, or is drawn in the regular course of business, the indorsee, though he has not given to the indorser, the full amount of the bill, may recover the whole, and be the holder of the overplus, to the use of the indorser; but where the bill is an accommodation one, and that known to the indorsee, and he pays but part of the amount, he can only recover the sum he actually paid for it.” On this case, I remark first, the ques *202 tion of usury was not raised. Wissen, the plaintiif, seems to have been considered as a trustee for himself, so far as he had advanced money on the bill, and for his endorser, as to the residue, he may have been so in fact; the bill may have been indorsed to him, only as security for the money advanced. If that was so, then, as between him and his immediate indorser, the court was certainly right. Yet I cannot perceive even in such a case, what difference it would make, whether the bill was an accommodation one, as between the drawer and acceptor, or not. Suppose Yates did accept for the accommodation of Roberts, and the plaintiff knew that fact when he took the bill, yet if Ould was a bona fide payee of the bill for a valuable consideration, he, or his bona fide indorsee, could certainly recover tlie loholc amount against either the drawer or the acceptor, (Brown v Mott, 7 Johns. R. 361; and cases there cited.) I can only understand the reasoning of his Lordship, by supposing Ould the payee of the bill, had given nothing for it, and that he too indorsed it for the accommodation of Roberts the drawer, and only as security for the money advanced by the plaintiff. But, secondly, however that may be, I cannot believe that Lord Kenyon in so summary a manner, atNisiPrius, intended to establish the doctrine contended for; and if he did, he certainly has not been followed at Westminster Hall.
It is remarkable however, that while the courts of New York have based their decisions on what was said by Lord Kenyon in that case, they have signally departed from the rule laid down by him. His Lordship decided, that if the indorsee of a bill drawn for money really due, has not given the indorser the full amount of the bill, he may recover the wholesum due upon it, in an action against tfie drawer or acceptor, but that he shall hold the surplus to the use of his indorser. Whereas, the'New York decisions, in all such ases, give the surplus to the indorsee.
The earliestNew York case to which we were referred, as sustaining the doctrine supposed to be recognized by Lord Kenyon in Wissen v Roberts, is that of Brown v Mott, 7 Johns. R. 361. But the point of that case, has no application to the question now before the court, and all that is there said about Wissen v Roberts, is, that if the plaintiff had “purchased,” or taken up the note in question, at a reduced price,' “it would seem” (upon the *203 principles of that case,) “that he could recover only the amount paid.”
Wo are next referred to the case of Braman v Hess, 13 Johns. R. 52, in which the action was by an indorsee against his immediate indorser, on a note for three hundred and forty-three dollars. On the trial, the defendant offered to show, “in mitiga* tion of damages,” that he had transferred the note to the plaintiff, at a discount of ninety dollars. The question, whether the discount had been usurious, or not, does not appear to have been raised. The evidence was rejected, and a verdict rendered for the plaintiff for the whole amount. On a motion for a new trial, the court say, that the evidence ought to have been admitted, “according to the principles which governed the case of Wissen v. Roberts, 1 Esp. Cas. 261.” And what appears to me singular, it is added, “and which was adopted and sanctioned by this court, in Brown v Mott, 7 Johns. R. 361.” I must be permitted to remark, that in my opinion, the court, in Brown v Mott, so far from having adopted and sanctioned,” the principles supposed to be involved in Wissen v Roberts, referred to it in a very doubting and questionable manner. But be that as it may, there was clearly nothing in the case of Brown v Mott that in any way called for an expression of opinion upon the doctrines (whatever they are) contained in Wissen v Roberts. The reference made by the court to that case, seems to have been entirely incidental, and as probably giving the rule, if the facts had been the same as in that case. But to return to the case of Braman v Hess; the court proceed to say, “that if the suit had been by the indorsee against the maker, it would not lie in the mouth of the latte?, to say that the plaintiff purchased it, (the note) at a discount,” and certainly it would not, if the plaintiff had “purchased” the note, in the proper sense of that term: that is, if he had bought the note without recourse to the vendor. But if he was an indorsee of the note, according to the custom of merchants, with recourse over against his indorser, upon the ordinary commercial contract of indorsement; then I insist the maker of the note would have a right to inquire into the consideration given by the plaintiff, not it is true for the purpose of reducing the damages, but to show that the plaintiff had obtained the note upon an unlawful and usurious contract.
*204 The question of usury, seems not to have entered into the consideration of the case, either by the court or the counsel; and the plaintiff was considered and treated as a mere purchaser of the note, without attending to the plain and obvious distinction, between a sale, and a commercial negotiation of the paper by a general indorsement.
The next case cited from New York, was that of Munn v. The President and Directors of the Comm. Co. (15 Johns. R. 44,) in which, the court settled down upon the broad principle, that where the bill or note, is valid as between the drawer or maker and the payee, so that the latter can maintain an action upon it against the former, at maturity, it is valid in the hands of an'indórsee who has discounted it at a higher rate of interest titan is allowed bylaw; and that he may recover the full amount against the maker, or any other party,-prior to his immediate indorser, though as against Mm, such indorsee shall only recover the sum actually advanced for the note or bill.
The same doctrine was fully recognized subsequently in (he case of Powell v. Waters, (17 Johns. Rep. 176,) and as stated and admitted at the bar, is now the settled rule of law in New York, on this subject.
The reason assigned in support of this doctrine, is “that a bill, free from usury between the immediate parties to it, cannot ho invalidated as respects those persons, by the subsequent conduct of any other person.”
The premises are admitted, but the conclusion, I feel bound to dissent from. The contract between the maker and the payee of a note, is one thing, and that between an indorser and indorsee, is another. The latter may be unlawful and void, while the former remains in full force. In such case, (he maker continues liable to pay the money due on the note, to any lawful owner of it, but not to a man who has acquired it upon a void contract; any more than he is, to a man who has found or stolen the note. It is manifest, that following the doctrine supposed to be involved in the case of Wissen v. Roberts, (1 Esp. Cas. 261,) the court have lost sight of or discarded the obvious and acknowledged distinction between a naked sale of a bill or note, without recourse to the vendor, as an indorser, upon the common law contract of indorsement; and a transfer of such an instrument, by a *205 general indorsement subjecting, tha parties, to ail the duties and liabilities annexed by the law of Merchants, to such a transaction.
It is equally plain to my mind, that in reaching thé conclusión to which they have come, the courts of New York, have overlooked the sound and acknowledged position, that every indorsement of a hill or note, creates a new and independent contract, between the indorser and indorsee: a contract, as specific and as well understood and defined in ail .its parts, as assy oilier known to the law. And if usury enters into, and lies at the foundation of that new and specific contract by which the indorsee derives Ills title to the note aad.the money due upon it, is not that contract “’utterly void, by the very terms of the statute? And shall the indorsee be permitted in defiance of the statute; to maintain any action, against any body, upon an “utterly.void” contract? Has not tlsc defendant, whether he he a maker, or an indorser of the note, a right to deny the plaintiff’s title to it; and in such case, must not the plaintiff show his title? And if he must prove it, may not the defendant controvert it? And ifit turns out, that the plaintiff’s title is founded on a transaction or contract, malum prohibitum, or malum in se, may he notwithstanding that, recover upon it ? If the plaintiff iias found the note, or obtained possession of it by fraud, or won it at gaming, or even stolen it, may lie recover upon it against the maker, simply because, as between the original parties, it was an honest and available note?
In the case of The President, &c. of the Bank of the U. States v. Owens & al. 2 Peters, 527, it was held that although the charter of the Bank only forbids the taking of greater interest than six per cent, and does not declare the contract void; yet, that a contract by which the Bank reserved a greater interest, was void npon general principles: “ that courts of justice are instituted to carry into effect the law's of a country, and they cannot be auxiliary to the violation of those laws. There can be no civil right, where there can be no legal remedy: and there can bejio legal remedy for that which is itself illegal.” “ Ex lurpi causa, non oritur actio,” (1 Bos. & Pul. 340; 1 Esp. Cas. 13.) and the case of Amherst v. Maze, 2 Bos. & Pull, 374 and many others cited by Mr. Justice Johnson, in 2 Peters, 539, & seq. show there is no difference, as to vitiating contracts between ma *206 lumin se & malum prohibitum: and that contracts against public policy, as well as those contra bonos mores, are equally void.
I am aware, that the answer to all this, is,- that upon the principles of the New York cases, it is not usury, nor in any manner unlawful, for a broker or any body else, to obtain a note, at any discount, however exhorbitant, since under those decisions he can hold the indorser responsible only for the sum actually paid him. Without stopping to inquire what, upon the principle of those cases, would bo the condition of such an indorser, in a suit against him by a subsequent innocent indorsee, for a valuable consideration, and whether lie would not be liable for the whole amount due on the note, I feel constrained to remark, with all respect, that those decisions, have in effect, to a great extent, repealed the statute of usury: and materially altered the common law. I. First, They have repealed the statute of usury. The statute avoids every contract for the loan or forbearance of money, upon which more than legal interest is taken or reserved. But every discount is a loan, and every transfer of a nolo by a general indorsement, is a contract.
1, Every discount of a bill or note, is a loan, and includes a contract for forbearance. I use the term discount here, in its appropriate mercantile sense, as distinguished from a sale, of a note or bill — a distinction which I shall attempt to illustrate hereafter.
In Auriol v. Thomas, 2 T. R. 52; Hammett v. Yea, 1 Bos. & Pull. 144; Marsh v. Martindale, 3 Bos. & Pull. 154, and in almost all the English cases, I have looked into, the discounting of a bill or note is spoken of and treated both by courts and counsel, as including in it, ex vi termini, a contract for a loan. Mr. Byles in his treatise on bills, p. 72, Law Lib. Vol. 16, says, “ the ordinary transaction of discounting a note, is a lending, within the statute. The party discounting, does in fact lend money on interest, to be repaid, either by the person receiving, or by some other party to the bill, at a certain period.”
But authorities are not necessary to establish this position. It results from the very nature of the transaction. It is not necessary in order to constitute a loan, that there should be in very terms, an application to borrow, or an agreement to lend. Every advancement of money, for the accommodation of another, to be *207 repaid to the person making the advance, by the person receiving it, or by any person for him, or by or out of his funds, is literally and legally, a loan of money. Byrne v. Kennifeck, 1 Batty’s R. 273; Fireday v. Wightwick, 1 Tomlyn’s R. 250. Whoever therefore gets a bill or note, discounted at Bank, or by an individual, gets a loan. He literally borrows money. If it is on accommodation paper, it is to be repaid at maturity, by himself, or by his friend for him. If, on a business note, received by him for a valuable consideration, he pledges, by a transfer of the note, his own specific funds, for the repayment of the money, and suporadds his general responsibility by indorsing the note.
In short, the position that an ordinary discount of a note or bill, is not a loan of money, is contradicted, not only by the common sense of the community, but by innumerable cases in England and in this country, in which, discounts have been held tobe usurious, which all admit, they could not be, unless they involved a loan of money.
2. Without pursuing this subject any further, I proceed to consider the Second proposition; That every transfer of a note or bill by a general indorsement, is a contract.
Great ingenuity has been displayed in building up this new, and to my mind very extraordinary system, by which, a premium is held out to brokers and money dealers, to discount notes, upon the most oppressive terms, under the sanction of law, with a guaranty, that they shall bono losers in the end. The operation is this: if the maker or any prior party to the note, is solvent and able to pay, the broker gets the whole amount, and pockets the exhorbitaut excess of interest, be has screwed out of the needy indorser. But if ho fails to recover from the maker of the note, he may come back upon bis indorser for the money advauced with interest, it is obvious, that upon this principle, it is greatly for the broker’s interest to obtain the noto as cheap as possible: for the less he gives for it, the greater his profit, if the maker is solvent; and the smaller his loss, if all parties should fail.
Among other arguments in support of this system, it is said, the indorsement of a note, is no part of the contract, between the indorser and the indorsee; that the latter derives his title from the sign manual of the indorser, and not from the contract between them — that the only contract, between the indorser and *208 indorsee, is the implied one, that if the. maker fails to pay at maturity on demand, the indorser will pay; and that the indorsee’s title to the note, is not founded on this implied contract, but is derived from the hand writing of the indorser on. the note.
This is certainly ingenious, not to say specious: but laying ah sophistry aside, I appeal to the honest feelings of every professional man, whether the substance and legal import of the contract between the indorser and indorsee, is not, that in consideration of so much money paid by the latter, the bolder of the note agrees to transfer it, by indorsement, to the indorsee, with the money due and to grow due upon it, with'recourse to the indorser on failure of payment by the maker, upon his being duly requested so to do?” And if such be the contract in legal effect, I desire to know, whence the indorsee derives his title to the note, if he does not acquire it by that contract? To say that the indorsement passes the title to him, is begging the question. It is true the indorsement, gives the indorsee, prima facie, a title to the note:- but it does so only because it includes and' is evidence of the contract under which he claims if.
Again; if the indorsement of a notéis no contract, in what sense, can it be said, that every indorsement of a note is equivalent to a new bill of exchange? And yet our hooks, declare it to beso, and the ablest Judges have maintained that position. I believe-it will not be said, that a bill of exchange is not a contract — nor that a bill of exchange, cannot be made upon an usurious consideration., '
If, as I think has been shown, every discount of a note, whether By a Bank, or an individual, includes a loan; and if the indorsement of a discounted note; constitutes a contract, between the lender and the borrower, ,then it follows that the New York decisions, to which we have been referred, have to a great extent, repealed the statute against usury. But,
M, The decisions in New York, have materially altered the common law. By the long established and well settled principles of the common law, in relation to commercial and negotiable paper, the payee or subsequent holder of a bill or note, by putting his name on the bask of the instrument, not‘only transfers his property in it, to the indorsee, but makes himself liable for the whole amount of the note, upon failure of payment by the *209 maker. He is bound by such indorsement, as effectually and to the same extent, as if he was the drawer of a bill of exchange. The contract is as specific and binding, in the one case, as in the other. The rule which admits of an inquiry into the consideration, in actions between tiie immediate parties to negotiable paper, has no application to this subject. That rule is in affirmance of the contract created by the note, or the indorsement; and for the sake of avoiding circuity of action, or recourse to a court of equity, lets in the party, to an equitable defence. But the effect of the decisions referred to, has been to modify and alter that contract — to declare that an indorsement shall not bind the indorser, as at the common law: that it shall operate as an indorsement for the purpose of-passing the title and fixing the liabilities of prior parties; but as between him and his immediate indorsee, it shall not bind him, as indorser, but only operate as a special contract, making him liable to refund the money he has received. I cannot perceive by what right, sitting in this place, we can adopt such a principle.
Another argument drawn from the cases referred to, denies all distinction between a sale and a discount of a note; or at least, it is insisted, that a party may sell a note, and yet transfer it to the buyer, by a general indorsement, thereby making himself ultimately liable, as indorser, according to the rules of law applicable to commercial paper.
To my mind, the difference between a sale, and a negotiation or discount of a bill, in the ordinary course of trade, is so palpable, that I feel some reluctance in attempting to explain it. It cannot be denied that a bond, or bill or note, is as much the subject of bargain and sale, and as capable of being bought and sold, as any other article of property: and when so bought or sold, the contract of sale, is governed in all respects, by the same rules of law, that are applicable to contracts for the purchase and sale of other things. The vendor, as in other cases, in the absence of fraud and of any special agreement to the contrary, is answerable only for the validity of his title, and it may be also, for the genuineness of the instrument, but not for Its ultimate payment. But in the case of ordinary transfers of bills and notes, by indorsing the same, the rights, duties, and liabilities of the indorser and of all other parties to the instrument, are of a very different *210 character; and'are regulated and governed by the law of merchants, applicable exclusively to this species of securities and contracts.
. if then, a discount and transfer of a note, by an unqualified' indorsement, is a sale of it; by what authority, I would respectfully ask, can the court, in the absence of all fraud, hold the vendor liable to refund the consideration money, with interest, to the purchaser? I am at a loss for art answer; and disposed as I always am to treat with great respect, the judicial decisions of our sister states, f cannot defer to them so far, as to adopt a system at once, repealing in effect, the statute of usury; abrogating in part, the common law, on the subject of negotiable paper, and permitting a purchaser to sue his vmdor, to recover back the purchase■ money, because lie cannot get the value of the article he has bought, from other persons; a doctrine more favorable to usurers, the most heartless of them, could not desire. A similar course of decisions in England, would have relieved the courts at Westminster Hall, in a multitude of cases, from the trouble of deciding, when the discount of a note was tainted with usury, and when it was not. But they have not ventured so far to encroach upon the legislative department of the government.
But the distinction between a sale and a discount of a bill of note, is recognized and illustrated by numerous English writers and cases.
Mr. Bytes, a very recent and respectable writer, in his treatise on bills of exchange, page 91, says, “if the bill or note be delivered witiiout indorsement, not in payment- of an antecedent debt,” but for a valuable consideration passing- at the time, “such a transfer is held to be a sale of the bill, a purchase of it, with all risks, by the transferree.” In Fenn v Harrison, 3 T. R. 757, Lord Kenyon says, “ibis: extremely clear, that if the holder of a bill, send it into market, without indorsing his name upon-it, neither morality, nor the laws of the country, will compel him to refund the money, for which lie sold it, if he did-not know at- th.e time that it was not a good bill; and see Evans v Whyle, 5 Bing. 485; Ex parte Shuttleworth, 3 Ves. 367; and other cases cited in Byles on Bills, 91, &c. see also 1 Holt's R. 256, in 3 Engl. C. L. R. 87, in note.
In my opinion, therefore, every transfer of'a note by an un *211 qualified indorsement of it, upon a discount, whether for more or less than the legal rate of interest, does import, and includes a contract for a loan of money. But the mere fact, that a greater sum was retained, than the legal rateof interest, does not of itself constitute usury: it is only evidence of usury, and will be sufficient to establish it, unless satisfactorily explained, by shewing, that the excess was not stipulated for, as a consideration for making the loan or discount, but to meet the difference of exchange, between the place where the discount was made, and the place where the note or bill was payable; or to cover the expences of remittance, in case the borrower wished to have the proceeds transmitted to some other place.
Whether, usury, or not, is in all such cases, a question of fact for the jury, under the direction of the court.
In Hammett v Yea, 1 Bos. and Pul. 144, the plaintiff discounted several promissory notes for the defendant, who was the payee of the notes: after deducting the whole interest for the time the notes had to run, the plaintiff asked the defendant how he would have the money, upon which the defendant said he would have a certain part of it in cash; another part carried to his account, and the residue, in bills on London, some at three, some at 7, and the rest at 30 days. The transaction was closed in that way, the plaintiff making no allowance for the times the bills had to run. Eyre Ch. Justice, left it to the jury to say whether this was a case of usury or not, charging them, that if the excess of interest, was not more than a reasonable compensation for the plaintiff’s trouble in making the remittances to London, it was not usury, unless the mode of payment had been made a condition by the plaintiff on which he would discount the notes. A verdict was rendered for the plaintiff, and a new trial refused.
In Marsh v Martindale, 3 Bos. and Pul. 154, Lord Alvanley, Ch. Justice of the Common Pleas, says, that the cases of Auriol v Thomas, 2 T. R. 52; and Hammett v Yea, 1 Bos. and Pul. 144, have completely established, that in the discount of a bill, a hanker may take more than legal interest, if the excess be honestly taken to defray the expence of remittance; and in such cases, he adds, “the only question is, whether it he a real discount, in the way of trade, or a mere loan of money.”
These cases fully explain my own views upon this subject: *212 which are, that if a party discounting anote, upon an unqualified indorsement of the holder, retains more than the legal interest, it will taint the transaction with usury; unless the excess, was taken for some honest purpose, as for the difference of exchange, the expence of making a remittance, or other service to be performed for the convenience of the borrower: and whether such remittance or other service to be rendered, was made a condition of the discount or not, is a question of fact for the jury. (See Byles on bills, 73, and seq. in 16th Law Library.)
But even if the facts offered to be proved on the trial of this cause, would have made out a case of- usury, the evidence was inadmissible, unless such usury would, have constituted a bar to the action. This brings me to the question:
2. Whether the indorsee, who has acquired a note upon an usurious contract between him and his indorser, can recover upon it, in an action against the maker, or a prior indorser?
Considering every indorsement of a note, as a contract between the indorser and the indorsee, by which the former transfers to the latter, the-title to the instrument, and to the money due upon it, and guarranfees upon certain conditions, the ultimate payment thereof; and then recollecting tiiat the statute of usury, declares that every contract made contrary to its provisions, shall be titterlly void; I should have supposed such a question could never have been gravely asked in a court of justice.
But it is said, the note was a valid one, unaffected with usury, and the maker justly owes the money, and ought to pay it: So he ought, but not to any one, except to the lawful owner of it. He ought not to pay it to a man who has fouhd the note, or stolen it, or to one who has gotten it by usury. Let the usurer let go his grasp, let him restore the note, to the man from whom oppressively and in violation of law, he obtained it, and then the maker ought and would be bound to pay it.
The case of Gaither v The Farmer’s Bank, 1 Peters’ R. 37, is directly in point. The note in that ease, was a valid one; the money was justly due from Gaither to Corcoran, and though the suit stood in the uame of the Bank for the use of Corcoran, the court looked through the contrivances, and would not permit a recovery by the Bank. They held the indorsement to be void, on the ground of usury. Mr. Justice Johnson’s attempt to dis- *213 103, is unsatisfactory, and I think unsound. The argument amounts to this; if a man borrows money at usurious interest, and gives his own note for it, and then as collateral security, indorses to the plaintiff, a valid note, no recovery can be had by the indorsee on that note; but if instead of giving his own note for tiio loan, he, in the first instance, indorses the valid note to the plaintiff, then he may recover upon it. I say the argument comes to this, unless we adopt the notion, that the indorsement of a note upon a discount greater than legal interest, is only a sale of tiic security, except where such transaction takes place upon a specific application for a loan.
But in Lloyd v Scott, 4 Peters, 224, the Supremo Court of the United States held, that a loan may be either express, or implied: and that case too, is an answer to the argument, that because the defendant owes the money, ho is bound to pay it» Lloyd had purchased a house of one Scofield, with notice of, and subject to an annuity, or annual rent of five hundred dollars, granted by Scofield to one Moore: yet when Moore, by his bailiff Scott, attempted to enforce the payment of the annuity by distress, Lloyd was permitted to set up usury between Scott and Moore in the agreement for the annuity, and did so successfully. In that case too, the obiter dictum, of Mr. Justice Johnson, in D. Welf v Johnson, 10 Wheaton, 367, that the plea of usury is personal and peculiar, was repudiated by the court, and is overruled by the decision.
One more remark upon that case: Mr. Justice M'Lcan, (its page 229) says, that an indorsee cannot recover on a note, where line payee’s indorsement, through which he must, of necessity claim, has been made upon an usurious transaction, and he cites Jones v Davison, 1 Holt, 255, as supporting that position, and in my opinion it does so.
The case of Rich v Toppin, 1 Esp. cas. 176; Pratt v Willey, Id. 40; Hattam v Withers, Id. 259; Braid v Ackerman, 5 Esp. cas. 119; Coomb v Miles, 2 Camp. 553; and Chapman v. Black, 2 Barn, and Ald. 589, shew that the plaintiff’s title may he impeached, by proving usury in the contract of indorsement, under which the plaintiff claims.
In Lowes v Mazzaredo, 1 Starkie, 385, and cited at large in Comyn on usury, 175, in 5 Law Lib. 68; the bill was a good *214 one in its creation, the drawee being indebted to the drawer in the amount of the bill when lie accepted it; yet in an action against the acceptor, he was permitted to show that the payee of the bill, when he indorsed it to those under whom the plaintiffs claimed, did so upon a usurious consideration. Lord Ellenborough said, that “the bill having been stained be the payee, with usury,” (through whom every subsequent indorsee must claim,) “could never be effective, until it was cleansed. Had it been called in by the payee, and republished, it might have received an effect de novo; but tainted as it was, every one must take it subject to its vice. It was impossible to reject one part of an indorsement and retain another part; but that it would be necessary to receive or repudiate the whole unsound matter.” Mr. Justice Bailey added, “that as every indorsement was considered in law, as a new drawing, the plaintiffs must necessarily claim under this new drawing, which was usurious.” The author, (Mr. Comyn, then remarks, “as therefore a bona fide bolder cannot recover upon a bill founded in usury” (Lowe v Waller, Dougl. 708) “so neither can be recover,” (even upon a valid bill) where the payee’s indorsement, through which be must claim, has been made upon an usurious agreement. But supposing the first indorsement to be valid, a subsequent usurious indorsement will not affect him,” (that is a bona fide indorsee;) because such intermediate indorsement is not necessary to his title; for in an action against any of the original parties to (he bill, the intermediate indorsement may be stricken out.
This in my opinion is the law of the land, and the rule by which every Judge will be governed, who likcEyre, Ch. Justice, in Hammett v Yea, desires “to carry.into effect a law which the policy of all times, has deemed useful, and which expressly provides against any subtle devices or evasions, by which its penalties may be eluded.”
The result of my reflections upon this branch of the case, is:
1. That the sale of a note, or bill, is one thing, and the transfer of such an instrument by a general indorsement, on a discount of it, is another thing. That they are as distinct as the contract for the sale of a horse, and the contract for the hire of one for a limited period.
®. That upon a sale of a note or bill, though the vendor should *215 obtain for it, a sum bearing no proportion to its real or apparent value, there can be no usury, unless such sale was only a device to evade the statute. (See the Reporter’s notes to Jones v Davison, 1 Holt’s R. 256.)
3. That if the party making a discount in the ordinary course of trade, and looking to the indorser, upon his contract of indorsement, for ultimate indemnity, retains more than the legal interest, it is not necessarily and per se, usurious: it may he so, or it may not: at most, it will be but prima facie usurious, and be so considered, unless the indorsee can shew that the excess was taken for a lawful purpose, and constituted no part of the contract or condition, on which the discount was made.
4. That whether usurious, or not, is a question of fact for the jury, under the direction of the court. And
5. That if the contract between the indorser and the indorsee, was usurious, the indorsee can maintain no action against the maker, or any prior party to the instrument, though good in its creation, But
G. If a note, whether for value received, or for accommodation only, is fairly negotiated by the payee, and a subsequent party indorses it upon a usurious discount, and it afterwards gets into tiie hands of a bona fide indorsee, without notice of the usury, he may strike out the names of the usurious parties, and make title through the payee, or any innocent indorser subsequent to him, and recover upon the note.
I will only add, that since writing the foregoing opinion, my attention has been directed to the very elaborate and able argument of Chancellor Walworth, in Cram v Hendricks, 7 Wend. R. 569, in which, although, he was overruled by a majority of the Court of Errors, he lias fully sustained himself, and vindicated my views upon this subject. An earlier acquaintance with the Chancellor’s argument hi that case, might have saved me much trouble, by referring to it. as expressing iny own opinion. But as many members of our bar, may not bo in possession of Wendall’s Reports, I have thought best to give my own argument at length.
In my opinion, the verdict ought to be set aside, and a new trial granted.
*216 White, J.
This cause was tried at the Essex Circuit before Justice Ford, and a vei'dict rendered for the plaintiff. And the defendant not being satisfied with the verdict, asked for a new-trial, and he rests his application to the court, on the sole ground, that the Justice at the circuit, refused to admit one William B. Woodruff, a witness offered by the defendant, to give evidence, and who was objected to by the plaintiff.
This suit was brought by Freeman the plaintiff, on a note made by the defendant, and given to one Grover Miller, and regularly indorsed by Miller and John P. Jackson to Charles C. Baldwin; it was afteiwvard indorsed by Baldwin and William B.’Woodruff, and with those several indorsements thereon, came to the hands, of the plaintiff Freeman. The plaintiff, after proving the making of the note, by the defendant, and the several indorsements, as set out in the first count of his declaration, read the note in evidence, and rested his cause.
The defendant, under the general issue by him pleaded, offered William B. Woodruff as a witness; and to prove by him, that he the witness as the agent and in behalf of the plaintiff, had advanced money to Charles C. Baldwin, (the third indorser) upon this note, and received the note at a discount at more than the legal rate of interest, and that-Baldwin indorsed the note, and transferred it in consideration of such advancement. This evidence, the plaintiff objected to, on the ground that Woodruff the witness, was an indorser of the note. The Justice sustained the objection, and the witness was rejected. The jury rendered a verdict for the plaintiff, for the amount due on the note.
The making of the promissory note and the making of the several indorsements prior to that of Charles C. Baldwin, are not disputed, but admitted to have been legally and properly made: but it is said by the defendant, that he is not liable to be sued on this note by Calvin Freeman, the plaintiff; because no legal right or title to' the note was transferred to him by tiie indorsement of Baldwin or Woodruff; and therefore he could have no right of action on it, against the defendant.
This is a case of a good and valid note, regularly indorsed to, and available in the hands of Charles C. Baldwin the third indorser; and by him, indorsed under an agreement made with Wm. B. Woodruff, the agent of the plaintiff Freeman; that *217 Baldwin should in consideration of the money advanced to him by Woodruff as the agent of Freeman, indorse and transfer the note. The sum deducted or reserved for discount, was more than legal interest; and the note was indorsed and transferred in pursuance ef said agreement. Woodruff the agent, also indorsed the said note; but whether before or after he delivered the note to his principal, is not stated.
This was not a note to be collected in a foreign country, or distant place; it was a neighbourhood transaction; and it may be assumed as a fact, that here was no sale of this note, in consideration of insolvency of the maker, or any extra risk or expense of transmitting the note to a distant part for collection; and I think it cannot be presumed that the plaintiff was an innocent or ignorant indorsee or holder, for a full, fair and lawful consideration.
This case now presents to the Court, three questions for consideration.
1. Whether the discounting a note, and retaining more than legal interest, is usurious.
2. Whether usury, in the discounting a note, is a good defence at law, in a suit brought by the usurer, or any subsequent indorsee, against the maker of the note.
3. Whether an indorser of the note, is a competent witness to prove the usurious contract under which the indorsement was made.
It is I think laid down in many cases to be found in the books; ami I think they stand uncantradicted, that, the discounting a note is a loan, or lending of money, and if the discount taken is more than legal interest, and the borrower becomes liable as indorser, it is a contract within the statute, for the loan of money at unlawful interest, and therefore usurious. There is both an usurious agreement, and a taking at the same time, more than legal interest. If this is so, then is the agreement or contract void by the statute, and the indorsee of the note, can obtain no right of action under it: He may as well bring suit on a note which he may have found in the street, with the indorsement of the payee on it, made for the use of some other person.
The plaintiff must show, that he has a right of action; the *218 note must be indorsed for his use — it must be a legal contract-not a contract void by the statute of usury.
Pothier in his treatise says, “ there is no objection to the fair purchase of a bill or note, either in law or conscience, provided the solvency of the debtor is doubtful, and no engagement or liability of the vendor to guarantee the payment; nor would the known solvency of the payer make any difference, if no guarantee.
If the purchase is made for less than the value, and the seller is held liable, such a purchase is unlawful as a loan upon usury;” for says this distinguished Jurist, “if I sell you for nine hundred dollars, a debt of one thousand, which I become liable to pay myself, if the debtor does not, it is the same as if you lend ine nine hundred dollars on my engagement to pay you one thousand dollars.”
In 2 Burrow, 676, Heylin & others v. Adamson, it is said that every indorsement is as a new drawing of a bill, and every indorser as a new drawer.
1 Lord Raymond, 443, in Lambert v. Oaks, a discount and indorsement subjects the indorser to an action, because it is a conditional warranty, and makes a new contract.
If a man sells a note of another, payable to himself, at a greater discount than legal interest, and indorses it himself, it is usurious. 2 Conn. Rep. 175.
In the Court of Appeals in Virginia, it was held, that if a broker sells a note at a discount of more than legal interest, and becomes indorser, and thus liable to refund, it is usury. It is a sale if not indorsed, and is fair; but if indorsed, it becomes substantially a new security for the money advanced.
In the case of Masa v. Dauling, 2 Stra. 1243, Justice Lee left it to the Jury to say whether it was a loan or a purchase; and on their pronouncing it a loan, it was held to be usury.
A man may sell a bill or note at any price, if there be no shift or device, but if he indorses it, then it becomes a question for the jury, to say whether it was not a shift for a loan. Hard. R. 256.
In Lowes v. Mazzaredo, 1 Stark. 385, it was held that a discount deducting one half per cent commission, and five and a half per cent premium, was usurious, and in many cases afterwards, it was so held.
In some of the cases in the New York reports, there seems to *219 be á rule that the holder of a note discounted at usurious interest, may maintain a suit against the maker of the note, and recover the whole amount; hut, if he calls on the indorser, with whom the usurious contract was made, he shall recover only the amount actually advanced to him. I do not seo how under our statute, by which, an usurious agreement is absolutely void, such a rule can be established. This distinction having been made in a foreign and commercial state; where the mercantile influence is very great, and great strides are made to uphold this kind of mercantilo currency, and where policy may justify or excuse the bending of rules of evidence, to promote, the circulation of negotiable paper, can form no rule to guide this Court in a case of usury under our statute.
2. Is usury a defence which may be set up in a court of law, and proved by lawful and competent testimony? This point appeared to me to be but little pressed by the, counsel of the plaintiff, and f think it is now too well settled, to be made a serious question, ff it were not so, then would the law against usury, made to protect the needy and oppressed, and, as is observed by cue of the Judges, “to protect a man against himself/’ be rendered useless, and the needy borrower would be at the mercy of the money lender and the brokers.
From such a state of things 1 would say, “good Lord deliver us.”
3. The remaining and only serious question is, was Wm. I?. Woodruff the witness offered, & who had indorsed this note, a competent witness, to prove an usurious agreement, or rather to prove that the note in question was discounted by the plaintiff, and that ho retained for discount, a sum greater than legal interest; and that the note was indorsed by the borrower in consideration of the money advanced; from which the jury might draw the conclusion that it was a usurious loan? Woodruff was not objected to as an interested witness, or on account of any other disability known at the common law; he had not been convicted of any crime, to render him infamous or base; he, stood on the footing of other witnesses, unless the fact, that he had as the agent of Freeman, the plaintiff, made the unlawful agreement, contrary to the policy of our law, and that this rendered him base; or that the indorsement made by him to the plaintiff, who had a perfect know *220 ledge of the whole matter, has so debased him as to make Inns an incompetent witness.
N”ow I am not prepared to say, that even Baldwin, who may under embarrassed or straightened circumstances have been induced to make this usurious agreement, and received the money, was rendered base thereby, or that Wm. B-. Woodruff who as a broker, friend or agent of the plaintiff, and at his request, made the agreement and furnished the money, became thereby so debased as that by reason thereof lie could not be a competent witness in a court of justice. If he is rejected because base, having no interest, he should be rejected in any case where his baseness could be made appear; a rule which will reject a witness as base, whose turpitude is such that on that account only lie is not to be heard, he should not'be received as a witness in any cause; and I am unwilling to lay down a rule of evidence, which will exclude the testimony of one man on account of his turpitude, and consider another man who was concerned and a party to-the same base transaction, as a good and competent witness if. offered in the same cause. Indeed if! were called upon to decide between them, I should consider the man who paid the discount as less base, than he who received the discount under the usurious agreement.
In the case of Baker v. Arnold, determined in New York, 1 Caines Rep. 258, one of the Judges is reported to have said, “it would give him less offence to see such a man (as an indorser) expiating his fraud and effrontery in a pillory, than attesting Heaven in the sanctuary of justice to the truth of asseverations-' which at once evince his turpitude, and destroy his credit.”
I am at variance, and open war with tiiis sentiment of the-learned Judge: he perhaps would have received-Mr. Baker, who was concerned in the same breach of the law, as a competent and credible witness, in any case where he had no interest. But asió him, I would say, it would give me less pain to see him expL» ating his fraud and effrontery, in a pillory or penitentiary, than to see him after grinding a needy man, and extorting from him,, usury, come into a court of justice, and protect himself from the offects of a wise and salutary-law, by shutting out the light, anil raising the cry of fraud and baseness against a man who was only made base by a. transaction in. which he himself was a. party:, and *221 though I would not willingly break a good rule, I would bend, or strain one until it was ready to crack, in order to do him justice. It is said in the Book of books, to which we all look for good sayings, correct principles, and moral sentiments; That on a certain day, it shall be alike with the giver and receiver of usury. And it is denounced as one of the sins of the people of Jerusalem, that they took usury and increase, and greadily gained of their neighbours, by extortion.
Before the case of Walton and Shelley was decided by Lord Mansfield, the turpitude of the payer of usurious discount, was never alleged as an objection to the competency of a witness. In that case, the witness was rejected as base and incompetent, for the sole reason, that he was the payer of usurious discount, and had indorsed the note in question. This is not in conformity with any rule laid down prior to that time.
Lord Kenyon says, the rule of evidence at Common Law is, that where the witness is infamous, and the proof of his conviction is produced; or where ho is interested in the event of the suit, there he cannot be received; and to extend the rule further, would be against sound policy and morality, and would be carrying the rule further than public interest would require or justify.
But suppose the witness to have been guilty of some illegal or immoral act, or cióme if you please, if he be not convicted, it forms no objection to his admisibility; and the books are full of cases, and every day’s practice shews us, that accomplices in crime — highway robbers, fornicators, and others, are received as competent and lawful witnesses against those concerned and connected with them in such crime; and the objection only goes to their credit.
But it is said that the witness by bis indorsement, lias given credit to the note which is a negotiable instrument, and it would be against sound policy to admit him to testify to any fact which would destroy the note or affect its negotiability. This I apprehend is carrying the mercantile rule too far: it is founding a rule of evidence on a partial inconvenience, to the destruction of a wise and salutary law, founded in sound policy; for the good of the whole community; and though the court may very properly consider the policy of a law, where there is a doubt *222 as to the construction thereof; yet when the only question is whether a law is to be carried into effect by the court — all reasoning about the policy of the law is foreign to the subject? whether sound in policy or unsound, is a question for the legistuve, not for the court.
it is asked by the counsel for the plaintiff, whether the rule of evidence laid down by Lord Mansfield in tiie Shelley case, was not necessary to support the character of negotiable paper. I think not. I think there should be no rule established on the ground of policy as, to negotiable instruments, which would tend to suffer an infringement of a public law made to protect the oppressed and needy debtor.
Although, in suffering this defence to be made and also supported by the- testimony of an indorser, may have its inconveniences, and be somewhat mischievous in its operation on this kind of mercantile paper, yet I think it is the least of two evils.
I am therefore of opinion that Woodruff was a competent witness and should have been admitted to testify as to the several matters offered to be proved by him: and that the verdict in this case, must be set aside, and a new trial granted.
Dayton, J.
The labors of the court in this case have beeii much lightened by the researcli and industry of counsel in collecting authorities.
That it was competent for the defendant below, on a suit against the maker, to prove usury, in the transfer of the note to the plaintiff himself, or to the indorser through whom he claimed, I cannot doubt. The plaintiff, instead of striking out the intermediate indorsements, filled them all up, from the payee down to himself. Having set out his chain of title, he was compelled to prove it. 1 Saund. on Pl. & Ev. 288; Chitty on B. 388; Waynam v. Bend, 1 Camp. 175; Lowes v. Mazzarredo, cited in Comyn on usury, 175; 5 Law Lib. 68; and what the plaintiff' was bound to prove, it was certainly competent for (he defendant to- disprove. The object of the defendant, was to show that the indorsement or transfer to the plaintiff was tainted with usury, and that he consequently liad no legal right to the note. It is not pretended that such subsequent taint would avoid the note, (which, be it remembered, was business paper,) against the ma *223 ker; but merely that the maker is not bound to pay to the plaintiff in this suit. If there were usury in the transfer, it is avoided by the statute, Rev. L. 969.
The first question therefore is, did the evidence which the defendant offered, show usury? The answer to this, depends upon the question whether an indorsement of a note, is per se, a contract for the loan of money: for it is well settled, that unless a loan directly or indirectly be contemplated, there can be no usury; 3 B. & C. 626; 4 Peters, 205; 7 Peters, 107, 3 Bos. & Pull. 154. I have reflected upon this point, and looked into the cases and cannot bring my mind to believe that such indorsement in the usual form, is of itself, plenary evidence of a loan. The common understanding and practice of mankind, is opposed to the idea. How frequent is it that peaceable men, professional and otherwise, who desire to escape the odium and annoyances of a lawsuit, or who may wish to avoid prosecuting their dealers or clients, pass away for less than the face, the notes of good men, deducting perhaps the interest due thereon? They indorse them, because they know the drawers to be good, and when pressed, will pay. There is indeed, in the affairs of life, an infinite variety of circumstances which induce holders to part with negotiable paper, and even indorse it, without thought of effecting a loan or the least wish to do so. The memory of almost every business man, will supply him with cases of this sort. If such transactions are to bo characterised as loans of money, they must be so in contemplation of law only, for in point of fact they are not so intended by the parties. But the basis of usury ah I understand it, musí be a loan intended in fact. The statute is for the protection of the needy, who from distress or necessity, are compelled to effect such loan. It never was intended io prevent a man’s selling absolutely a promissory note, or any other evidence of debt (and with a warrantee of its soundness) to do so. Such a principle, instead of promoting, would tend to injure the free circulation of negotiable paper, for which, the plaintiff in this suit has so strenuously contended. It is true, that the indorser becomes liable upon certain contingencies, for the payment of the note. Still, it is not his debt as in the case of a common borrower; he is its conditional guarantor only, or perhaps he may be said, on certain terms, to vouch the solvency of the drawer of the note; *224 yet this has not been held sufficient to avoid the transfer of bonds, though the°same were assigned for less than their face; 2 Hen. & Munf. 14; Hardin’s R. 82; 2 Munf. 36; 5 Rand. 33; 3 McCord, 365.
In the case now under consideration, the note was valid in its inception, and I cannot easily imagine any good reason why the party should not have the privilege of selling it (even with an indorsement) without having the transaction characterised in law, as a loan of money. Every other article of personal property, may be sold, and with a warrantee, without any such inference. Foreign Bills of Exchange, though indorsed exactly as notes of hand, are bought and sold at market price; and the difference between their nominal and actual value, depends not on the trouble of collection merely, (which in case of notes, is sometimes held to account satisfactorily in law, for asking more than legal interest) but like every other article, upon the demand and supply. The statutes against usury, do not reach this case; nor is it considered as a loan of money; yet no evils come of it. The character of the paper, is evidently most important as connected with the question of loan, or sale. If made expressly to raise money thereon, the transfer and indorsement thereof are unquestioned evidence of a loan. If not made to raise money thereon, the transfer and indorsement thereof, are evidence of a sale merely. But, I do not rely for the support of this position, upon argument so much as upon authority.
In the state of New York, the principle is laid down most broadly, that the indorsement of a business note, at a greater discount than legal interest, is not usurious; that it is not a loan of money, but the sale of a note. This distinction between tbe transfer of business and accommodation paper, has been recognised in that state, for nearly forty years. In Jones v Hake, 2 John. C. 60, a note was made by Watkins in favor of the defendant, indorsed by him and three others, then placed by Watkins in a broker’s hands, who discounted, or negotiated the same, at more than legal interest. It was held by Radcliffe justice, (Kent and Benson concurring) that “the note in question was made by Watkins, and indorsed by the persons whose names appeared upon it, for the accommodation of 0 atkins alone. No money was paid or value given by any of the indorsers.” Upon this ground, *225 it was held a case of usury. So in a like case, Wilkie v. Roosevelt, 3 John. C. 66, it was held by Kent, justice, that “the defendant who indorsed the note, musí, be considered merely as security, and as having lent his name for the accommodation of Mark and Co. He neither paid nor received any considerationfor the note. It passed immediately from Mark and Co. to Goodrich, for the purpose of being discounted at a usurious interest.” The transfer was therefore held usurious. In both these cases, it will be observed, that the decision was based upon the distinction between business, and accommodation pap; :-. I have cited them particularly, because they are cases decided w hen Kent was on the bench of the Supreme Coart of that state. The same doctrine has continued through subsequent decisions. Brown v. Mott, 7 John. R. 361; Braman v. Hess, 13 John. R. 52; Munn v. Commission Co. 15 John. R. 44; Powel v. Waters, 17 John. R. 176; Kent v. Walton, 7 Wend. 256; Cam v. Hendricks, 7 Wend. 569. The case last cited, was decided in the Court of Errors of that state, in 1831, after a laborious argument, and most elaborate opinions, in which the cases pro and con, are reviewed. The result of that case affirming the doctrine of preceding decisions, has finally settled'the law of the state of Mew York, in manner as heretofore stated.
But 1 do not rely upon the authority of a single. State Court, however respectable. Shortly after the decision of Cam v. Hendricks, the same question came before the Supreme Court of the United States, in Nichols v. Fearson, et al, 7 Peters, 103; and that court upon full consideration, laid down the same doctrine as had been adopted in New York. A business note had been indorsed and transferred at a discount greater than legal interest. This was substantially all the evidence in the case, and that court held unanimously, “that the indorsement of the note, did not necessarily import a loan,” and though made “without a stipulation against ultimate liability, does not necessarily imply a case of usury.” Expressly intimating however, that if in treaty for, or conclusion of a loan, the indorsement he expressly stipulated for, and as security for repayment, the law would be otherwise. But it is palpable that the onus of proving this additional fact, was to he on him who alleged the usury; without it, the allegation was not made out. This decision of the Supreme *226 Court of the United States, was in January T.,1833, and decides the very point now pending before us, upon the same evidence. The counsel on the argument, feeling the pressure of this case, endeavored to escape its force, by construing the language of the court, as meaning that such a discount was not necessarily and conclusively usurious, although, it was prima fade so. Or in other words, that the party against whom usury was alleged, might account for the excess of discount, by evidence aclinnde. This, in the first place, is obviously, a construction not justified by the language: the court did not call upon him against whom usury was alleged, to account for the excess of discount, but said, if the party alleging usury, can show that the transfer was for a loan, he may make out his case, but not otherwise; the onus is upon him. In the second place, the argument of the court, and its review of the cases cited, to show that such transfer was usurious, prove that such could not have been the meaning of the court. And in the last place, the facts of that case, did not call for the expression of such an opinion: it would not have decided the case. Or if it had, would have decided it directly the reverse of the actual decision. The question came up on the note and indorsement at a greater discount than legal interest, and nothing more; if this, prima fade, were a loan, and usurious, the defence was a good one, and the judgment below should have been affirmed without reference to the charge on the trial; but the decision was otherwise, and the judgment below was reversed. The applicability of this case, is unquestionable.
The same doctrine appears to have been held in Connecticut, by a-majority of the judges of the Supreme Court of Errors, in Lloyd v. Keach, 2 Conn. R. 175. It would require cogent reasons, to induce me to adopt an opinion upon a point of law directly at variance with the concurrent decisions of the Supreme Court of the United States, and the Supreme Court of the State of New York, constituted as they then were; Kent being in the one, and Marshall presiding in the other.
The defendant’s counsel rely upon a dictum found in Lyles on Bills; a late treatise on this branch of the law; where it is said, that “the ordinary transaction of discounting a bill or note, is a lending within the statute,” because, he adds, “the party discounting, does in fact lend money on interest to be repaid cither by *227 the person receiving, or some other party to the bill, at a certain prefixed time.” No authority is cited for this position, by the author of the treatise, nor «.vas any cited by the defendant’s counsel in their laborious and searching argument of the case. If the terms, “the ordinary transaction of discounting a bill or note,” be applied to such hills or notes as are made for discount, (which is perhaps the most ordinary form in winch this transaction occurs) it is doubtless, law; but it* the authority is to he extended further, so as to cover all casos of discount, I do not believe it to be law. It is not enough that money is advanced, which is to be repaid again in some way, or from some source; but a loom must exist, not in contemplation of law merely, but of the persons making it. If a man, for a sound price, dispose of a horse to a dealer, with a full warrantee, or goes even further, and warrants that he will brine; in market, a named price, say the consideration money, is that transaction, according to common understanding, (not according to learned and ingenious arguments,) a sale of a horse, or a loan of money? most clearly the former; and yet, in what does that differ from the transfer and indorsement of a note?
Many authorities say that the transfer of a note or bill, without an indorsement, or if indorsed, “without recourse,” is a sale, and though for less than its face, is not infected with usury: it may hence have been inferred that the reverse of this proposition is true. But this is a non sequitur; the language is not to bo extended so far as to embrace an entirely different and distinct proposition. Although I do not find any case in the English books, where this point has been raised and decided, yet there are cases where the general doctrine in Bytes on Bills, appears to have been assumed as correct. In most of these cases however, if not in all, the payee of the bill, was likewise the drawer for his own accommodation, and the usurious discount taken on the transfer from the payee, as in The King v. Ridge, 2 Eng. Exch. R. 30; that would be undoubted evidence of a loan, and of course, usurious. So too in Hammett v. Yea, 1 Bos. & Pul. 144, the suit was on a bond to secure the amount of sundry accommodation notes, and is a case of admitted loan.
If this doctrine has been assumed, it has generally been incases where the character of the paper is not shown, as in Magee v. *228 Simmons, 22 Eng. C. L. R. 266; or upon accommodation paper.
Prior to the case of Lowes v. Mazzaredo, decided 21 January, 1817, I think there is no English case which can be said to sustain the doctrine. But if the case last cited, be rightly reported in Gomyn on usury, that was a case of business paper, though many have judged otherwise; vide, opinions in Cam v Hendricks.
But, be this as it may, I rely upon the American cases cited, and upon the undoubted fact, that a man may, and often does transfer a note, and is willing to indorse it, who at the same time would not effect an actual loan if it were offered. I hold therefore, that an indorsement does not necessarily imply a loan, and though for less than the face of the note, is not necessarily, nor prima pacie ibsnrious. Undoubtedly an indorsement may be made as security for a loan, and when this is in fact shown to be so, by additional evidence, is usurious. Whether the sale of the note be really and in fact the object of the indorsement, or whether a loan be the object, and the indorsement intended as surety therefor, or a device to cover the'transaction, is a question of fact for the jury; Massa v. Dawling, 2 Str. 1243; Smith v. Brush et al, 2 John. R. 84; Dunham v. Dey, 13 John. R. 40; Cowie v. Harris et al, 22 Eng. C. & R. 270; 7 Peters, 109; 1 Dal. 217; 2 Eng. Exch. R. 34.
Notwithstanding this, it is the exclusive power of the court to decide whether a contract be usurious on its face; Archibald v. Thomas, 3 Cow. 284; and if the note and indorsement for less than the face thereof, were the only evidence to be offered, the question of usury, or no usury, would have been in my opinion, a question of law, and not of fact. And although it will be seen by the cases above cited, that it has been very generally the practice of courts to pass this question to the jury, with directions as to the law; yet in cases like this where all the evidence offered, constitutes no legal defence, I cannot see the necessity of doing so. It would be most important if connected with other matter: e. g. that it was an accommodation note, or indorsed on express negotiation for a loan, or something of this kind, as additional evidence; but alone, it was wholly unimportant; and whether the court overruled it, or directed the jury to disregard it, was one and the same thing to the defendant.
But the court, I think, mistook the law on the trial, and re *229 jecied tho witness, not because the facts standing alone, were immaterial, but because he, the witness, being an indorser of the note, was incompetent to prove the facts. What effect this erroneous position had upon the conduct of the defence, I know not; and though, as a matter of strict right, the party on this argument must bo confined to what appears upon the state of the case; yet the character, and legal importance of the questions involved are such, as in connexion with the erroneous position assumed by tho court, induce a belief that the purposes of justice will be best answered by a re-hearing of the case.
2. I have said that I think the court erred in considering Woodruff, the fourth indorser, an incompetent witness. That he had no interest in the event of the suit, is admitted, but it is said that the interests of the commercial world, require his exclusion; that public policy demands it. So much has been said and written upon this question, both in this country and in Great Britain, that I am reluctant to add to it; but I have considered the cases, pro and con, in detail; and notwithstanding the case in 6 Peters, 51, think the weight of authority is in favor of admitting the witness. I would have been much better satisfied if Judge McLean had, in that case, cited the English authorities upon this vexed point, more particularly as he appears to rest his opinions wholly on the case of Walton v. Shelley; which, he contents himself with saying, is yet the law. He may by this have meant that it was a proper legal principle in the abstract; but if he meant that the case was yet held law in the court or country where it was decided, a reference to the cases subsequent to Jourdaine v. Lashbrooke, in 1792, where it was first overruled, will clearly show that he was in error. 5 Esp. R. 119; 1 Camp. 408, N; 2 Camp. N. P. 599; 4 Taunt. 464; 5 Eng. C. C. 480; 9 Eng. C. L. R. 183; 22 Id. 268; 1 Saund. on Pl. & Ev. 214; Arch. Pl. & Ev. 439; 2 Stark. Ev. 298, Chitty on B. 413; Byles on B. 235. The authority of Walton v. Éhelley, is now discarded, and was so admitted on the argument, in all the English courts. So too in New York, the law of that case was first adopted, (Kent and Eaddijfe dissenting) but after some years’ trial, discarded, and the witness admitted, 5 Cow. 23. This rule, rejecting the witness, (which was adopted for the benefit of trade and commerce alone, and the rejection of which is depre *230 cated as ruinous to their interests) has been repudiated after a few years’ trial by the most commercial country in the world, (in whos'e jurisprudence it originated,) and by the most commercial state in our union: and yet, in each, I believe that commerce and credit have survived the shock! A little experience is better than much argument; and experience, I think, proves that the evils incident to the admission of the witness, have been much overrated. In Maryland, Tennessee and Virginia, the witness is admitted. In the latter state, after two arguments, he was admitted by the whole court; each Judge delivered his opinion at length, collecting and reviewing many of the American and English cases. 3 Rand. 316. And in the only case in which the question appears to have been presented in New Jersey, a majority of the court, 1 think, was likewise in favor of the admission of the witness, Penn. R. 791.
In another point of view, public policy would be best promoted by the admission-of the witness.
It is important for the interest of the community at large, and the protection of the needy, that our laws against usury be wholesomely administered. And yet in almost every case wheie the indorsement of a note is intended to secure an usurious loan, the facts are known only to the indorser and indorsee: and the exclusion of the former, on a suit against the maker, gives impuni- ' ty to the usurer, and defeats the policy of the law.
A new trial, I think, should be granted.
Nevius, J.
This suit is brought to recover the amount of a promissory note made by the defendant, payable to one Grover Miller and indorsed by him, John P. Jackson, Charles C. Baldwin and William B, Woodruff, separately. The first count in the declaration, sets forth all the indorsements, and the second only the indorsements of Miller and Jackson. The defendant pleaded the general issue. Upon the trial, the plaintiff proved the signatures of the drawer and the several indorsers, and read the note in evidence. The defendant then offered William B. Woodruff the fourth indorser, to prove that he had advanced the money, as the agent and in behalf of the plaintiff, to Baldwin the third indorser, reserving more than the legal rate of interest, and that in consideration of such advancement, Baldwin indorsed *231 and transferred the note to him. To this evidence, the plaintiff objected, and the court sustained the objection, on the ground that Woodruff was not a competent witness to prove the facts proposed. A verdict was thereupon rendered for the plaintiff, for the amount of the note.
Upon motion to set aside this verdict, the defendant insists that the court erred in rejecting this evidence; and in the argument, has presented for the consideration and decision of this court, these questions.
1, Whether the evidence offered at the trial, was competent and lawful; and
2, Whether the witness offered, was competent to prove the facts proposed to be proved ?
The note in question, is to be taken as a bona fide instrument given for a valuable consideration, and available in the hands of Baldwin at the time ho transferred it to Woodruff. The evidence offered and rejected, was, that in this transfer, a rate of interest was reserved, exceeding six per cent per annum. If such reservation amounted to usury under the laws of New Jersey, the evidence was lega! and competent and should have been received. To test this question, we are to inquire whether the transfer by Baldwin to Woodruff, was upon a contract for a loan of money to the former, or upon a contract of sale to the latter. A loan has been properly defined an advancement of money upon a contract or stipulation express or implied, to repay at some future day. A bargain and sale is the transfer and delivery of personal or real property, or chose inaction, by one person to another, in consideration of a price agreed upon between them, as the value of the property sold. The incidents appertaining to a contract for the loan of money, are few and simple; an advancement of money, by the lender at the time of the contract, and a stipulation or agreement to repay it and generally with interest, at a future day, by the borrower or some other person in his behalf and on his account. To constitute a legal sale, it is necessary that the thing sold shall be of some value either intrinsic or conventional; that the title of the seller shall be a good, valid and legal title; that the price be agreed upon by the parties or capable of being ascertained by evidence, that the title to the thing sold, vest in the buyer at the time of the sale; and the right to the price, vest *232 absolutely in the seller at the same time. In the sale of a chattel, the law raises no implied promise on the part of the seller, to repay or refund the purchase money in any other event than the entire failure or defect of title. Even if the thing sold be worthless, yet if the price was agreed upon and if no fraud has' been practised in the sale, the vendor is not bound to refund the price;
To apply these principles to the case before us, the transfer and delivery of a promissory noto by a general indorsement. Upon this transfer, there was an advance of money by Wood-ruff to Baldwin, and a promise by the latter to repay the amount ©f the n-ote, at maturity, on lawful notice of non payment by ihe drawer. The indorsement by Baldwin is not a mere transfer ©f title to the note, it is a promise superadded to that of the drawer and prior indorser, to pay the amount of the note at maturity. The transaction then, bears all the characteristics of & contract for the loan of money. It cannot be esteemed a mere sale, for in that case the receipt of the money by Baldwin, as the price or consideration of the instrument, would raise no implied" promise on his part to refund or repay either the amount received or any other amount, except in th® event of a failure of title. The promise raised by the indorsement, is wholly inconsistent with the legal acceptation of a sale. I am therefore of opinion that the transfer of a promissory note by a general indorsement whereby the indorser adds his own promise to that of the drawer to pay the amount of the note, is a contract of loan, and not a sale. I am aware that the Supreme Court of New York has adopted another rule to determine whether a note transferred by-general indorsement, is a loan of money or a sale of the instrument, and that those decisions have in one case, been followed by the Supreme Court of the United States. It has been there held that where the note is valid and available in the hands of the indorser, his transfer either with or without indorsement, is a mere sale and not usurious, although more than legal interest is reserved. But upon a careful examination of these cases, such rule does not appear to rest upon any solid foundation, but seems to be of modern origin, arbitrary in its character, and tending to confound transactions which in their nature are distinct. The Supreme Court of the United States appears to have adapted the- *233 New York rule, rather from the force of authority, than from the reason of the rule. This rule probably originated in tbe principle “ that a note valid and free from usury in its inception, cannot be invalidated as to the parties, by any subsequent transaction.” Admit this to be true, still it will not warrant the distinction drawn by the rule; for the note will continue valid against the maker, notwithstanding the usury between the indorser and indorsee, and though the Jailer may fail to recover, it is not because the original contract is vitiated, but because his title is defective, being founded upon a subsequent illegal contract. And if he be a party to such illegal contract, he should not complain that the drawer escapes from the payment; for it is not the fault of the law, but the consequence of its violation.
Believing that (he transfer from 3. to W. was a contract for the loan of money, it remains to inquire whether the reservation of moro than legal interest, under the circumstances of the case, of itself, rendered that contract usurious and void. Such reservation would undoubtedly be prima facie evidence of usury, but it might be explained and justified by a variety of circumstances: such, as that the note was payable at a distant place, and would be attended with some extraordinary expense in its collection: in such and like cases, it would be for a jury to determine whether the excess was a fair equivalent for such additional expenditure. S am of opinion therefore, that the defendant might lawfully prove the facts proposed, and that the same might and should have been submitted to the jury under the direction of the court, if the witness called to prove them, was competent to do so.
This leads to the consideration of the second question submitted by the argument; whether Woodruff the indorser could by his evidence invalidate the instrument to which he was a party, and to which he had given credit by his indorsement? Upon this question, much greater diversity of opinion has prevailed both here and in England, than upon the other. But I am not aware that it has ever before been distinctly presented for the decision of this court. Without adverting at present to the numerous authorities which have been cited by counsel and already referred to in the opinions delivered here, I will attempt an examination of the principles involved in the question.
The witness offered is the fourth indorser, and the fact to be *234 proved, usury in- the transfer to him, the effect of which is to destroy a title which he himself has given to the plaintiff. S asfe in the first place, what are his legal engagements express or implied, arising upon hrs indorsement? They are,
1, An express promise on his part, to pay the note at maturity, if duly notified of non payment by the drawer.
2, An implied stipulation that he is the owner of the note, and? legally authorized to make the transfer.
S, That the maker and prior indorser are legally bound for the payment, and
Lastly that there is not to his knowledge any thing connected with it, to render it invalid, or prevent the indorsee from recovering the amount specified in it.
For a breach of any of these engagements, he is hound to refund to any innocent holder ot the instrument. That he is liable to pay the amount of the note in case of non payment by the drawer and due notice of non payment, is too well settled to admit of question; and in an action brought upon his indorsement, it is no defence to allege that he was not the owner of the note; or had no authority to negotiate it; or that it was a forgery. Such defences cannot prevail, for they are all against his own-express or implied engagements. Nor can he avoid the responsibility of payment, although the note may have been void in its inception, on account of usury, for in that case, even if a 'recovery could not be had on the note itself, by reason of the statute-, still he would be liable for so much money had and received, on the ground of fraud practised on the indorsee, and for a breach-of his covenant that there was nothing within his knowledge connected with the instrument, that would vitiate or avoid it. If then, an indorser cannot avail himself of a defence in an action against himself, which- involves a charge of bad faith and a breach of his own express or implied promise made upon the transfer, upon what principle can he he suffered to defeat the action against the drawer, by avowing that he had knowingly and against all moral principle, transferred a void instrument, for a valuable consideration? But it has been urged that ,if the witness is not disqualified by infamy of character, want of religious faith, or interest in the event of the suit, all other objections should go to his credit. This though a general rule, is fay *235 from being universal, for there are many exceptions to it; and there is great reason why the present should be one. For there is much force in the remark, “ that to admit an indorser by bis own testimony to invalidate an instrument which by his own act, lie has declared to be good and available, would be against a rule of law founded in public policy, and destructive to the credit of all negotiable paper.” Whether such a rule can be traced in its origin, to the earliest records of the common law, or owes its existence to the introduction and use of mercantile paper and credit, it seems equally sustained by sound policy and correct principle. That lie who has voluntarily contaminated negotiable paper, by means of an usurious contract, and by bis indorsement, given it credit and currency, and held it forth to the world, as good and legal security for money, should be permitted by bis own oath to destroy that security in the hands of an innocent bolder, must be contrary to all moral principle and natural justice, and ruinous to the credit and circulation of such paper. No man would be willing to advance his money or property upon a security which may be blasted by the breath of the party who first contaminated it, and then falsely declared it good and legal. I cannot doubt therefore that it is against public policy, to admit a witness so circumstanced, to give such testimony. Nor can it be any objection to a principle of evidence, that it is founded in public policy, if that policy is clear.
All laws are designed for the well being and common interest of the society where they are to be enforced: and we have in the common law, many legal principles which originated in, and are wholly based upon views of public policy. And if occasionally a change in the trade and business of the country, or the interest and welfare of society, should give rise to a new principle of law, or new rule of evidence not before known to the common law, but essential to the welfare and safety of the public; there is no reason why it should not be adopted by courts of justice. If it be true therefore, that the rule laid down by Lord Mansfield in Walton v. Shelley was at the time, a new rule, to my mind it constitutes no objection to it. It only becomes more incumbent upon courts to examine with more care the reason upon which it is founded. And upon such examination, I am in favor of that rule with this qualification, that it be confined to negotiable paper, *236 and that the indorser be not incompetent to prove facts connected with the instrument, that occurred after his indorsement, unless he be so, by reason of other objections.
As to the decisions on' the subject, numerous authorities have been cited by the counsel in support of their respective positions. The first and leading case is that of Walton and others, assignees, &c. v. Shelley, 1 T. R. 296, where Lord Mansfield, Willes, Ashurst and Bailer concur in adopting the principle that a party who has signed a paper, shall not be permitted to invalidate it by his testimony, and they recognise it as one then well known. And in that case, the counsel in argument admitted the propriety of the general rule that no person ought ever to be permitted to invalidate any instrument or cash paper, to which he has contributed to give currency by affixing his name: but insisted that that rule had only been adopted in cases where"the action liad been brought on such specific nolo or bill, against the person liable. From the language both of the' court and counsel hr that case, it is fairly to be inferred that the rule then recognised, had been before settled and was well know by both. And although the question was afterwards repeatedly agitated in the English courts, and that rule seriously questioned, and afterward overruled in the case of Jourdaine v. Lashbrook, 7 T. R. 601, still its reason and propriety has been such as to secure its adoption by the most respected state tribunals in this country, as well as by theliighest judicial tribunal of the union. In Massachusetts, it has uniformly prevailed, and in New York as late as the year 1817, the whole court, consisting of Thompson Chief Justice, Spencer, Van Nest, Yates and Platt, declared it to be the established law of that state, and that there could be no sound reason for varying it where the holder was apprised of the fact of usury. 14 John. R. 270. And although more recently in the state of New York, as well as in other states, the doctrine of Lord Kenyon iu Jordaine v. Lashbrook, has been adopted, yet from an examination of the cases it will appear that the departure from Lord Mansfield’s rule in Walton v. Shelley, has only rendered the question more doubtful; and the reasons for such departure have never been satisfactory to the advocates of that rule.
In our own state, I am not aware that the question has been presented to this court for direct adjudication. In the case of *237 Roosevelt v. Gardner, one of the Judges remarked, “that the rule in Walton and Shelley did not stand on so high ground as some had imagined, yet he was not then willing to disturb it.” And in the case of Ferris v. Saxton, 1 South. R. 1, the late Chief Justice Kirkpatrick gave his entire assent to the rule, and remarked “that it was in accordance with the whole course of judicial proceeding before that decision.” In the Supreme Court of the United Stales, this rule has been clearly arid distinctly recognised in two cases where the question was directly presented, 6 Pet. R. 51; 8 Id. 12, and in both cases, by the unanimous opinion of the court. In the former, the court declare it “still to be the law in England, notwithstanding there have been some contrary decisions.” As this opinion has been twice expressed by that tribunal, it cannot be considered as hastily pronounced, without full and proper advisement.
Upon the whole view of the case, therefore, both upon principle and authority, it is my opinion, that tiie witness was not competent to prove the facts proposed to be given in evidence, and that the rule should be discharged.
Foim, J.
This action was on a note of Calvin Freeman to Grover Miller or order, indorsed by said Miller, John P. Jackson, Charles C. Baldwin, and William B. Woodruff, successively. The last indorsee, Isaac Brittin, proved the signatures of the maker and indorsers, aiul rested his casé. The defendant then offered to prove by William B. Woodruff, that Charles C. Baldwin indorsed the note to him upon a usurious agreement to discount from it, at a greater rate than six per cent per annum, for the time it had to run; that it was received under that agreement by the witness, as agent of the plaintiff, and indorsed by him to the plaintiff, who consequently had not any legal title to the note, because Woodruff’s indorsement was made void by the statute of usury. The plaintiff objected to the competency of the witness offered, not for any interest he had between these parties, but because he was one of the indorsers, and no person who has made or indorsed a negotiable note, is a competent witness, by his testimony, to invalidate it. That the Supremo Court of the United States had so decided upon a writ of error, after solemn argument, in the case of The Bank of the United States versus *238 Dunn, 6 Peter’s U. S. Rep. 51; and had afterwards confirmed if in the case of The Bank of the Metropolis v. Jones, 8 Pet. U. S. Rep. 12. Upon the authority of these cases, the indorser was rejected as an incompetent witness, by tiic judge; and the jury found a verdict to the amount of the note, for the plaintiff, a motion is now made to set aside the verdict, on account of the rejection of the indorser as a witness.
This is an old question at the common law, the discussion of which has successively agitated the English and American courts, for almost half a century; and a history of it will’ best exhibit the grounds of the dispute.
In the year 1786, which Was soon after the American revolution, this very point arose between Walton & Shelley, 1 Term Rep. 296, before Lord Mansfield and his associates in the King’s Bench, then composing the ablest court of common law ever known perhaps in England. That court decided unanimously, that, “no person who has signed a negotiable note, or bill of exchange, as maker, or indorser, is a competent witness, by his testimony, to invalidate it.” The reasons then and subsequently assigned for the decision, are these; that the name of the witness has caused it to circulate as a valid instrument: that it is equal to certifying under his hand, that the bill or note is a valid one; it is a pledge of his name and credit to the public, for the redemption of it as a good one, and the safety of mankind forbids his hanging out false colours to deceive them; that after he has indorsed his name, and obtained the amount for it, and passed it to other persons, it is contrary to good faith, that he should invalidate it by his testimony: that it is against the security of trade, since negotiable notes and bills of exchange are the very life of commerce; aud if they may be cut down, or blown up, by the very persons uttering them, any two or three men, conspiring together, may cheat the world; it is therefore against public policy, and a fraud by the common law, better deserving the pillory than the countenance of a court of justice.
The point stood thus decided in England, during the remainder of Lord Mansfield time. He retired about two years afterward, and was succeeded by Lord Kenyon as chief justice, and he, two years after his accession to the office, in the case of Bent v. Baker, 3 Term Rep. 34, gave a signal confirmation of the doc *239 trine, by an open and public declaration from the Bench, that, where a person has signed a negotiable instrument, he shall not be permitted to invalidate it by his testimony. His opinion was published to all England, and it stood as the established doctrine of the King’s Bench in Lord Mansfield’s time, confirmed in the same court in Lord Kenyon’s time, for the space of eight years, and governed commercial paper to the amount of perhaps millions in that time.
A matter of such importance to the commercial world, came soon to be considered in the courts of our own country, and the decision seems to have been approved of, and universally adopted in the most eminent courts of common Jaw in the United States, particularly those of New Hampshire, Massachusetts, Connecticut, New York, Pennsylvania, Virginia, and North and South Carolina, on the ground of public policy, and for the security of trade, inasmuch as the commerce of the world is conducted by negotiable notes and bills of exchange.
But a case occurred in England, of Rich v. Topping, 1 Esp. R. 176, in the year 1794, before Lord Kenyon at NisiPrius, where sitting without any associate, he unsettled the doctrino of the King’s Bench, by permitting the drawer of a bill of exchange, for which he had received the mosey and indorsed and put the note in circulation on the credit of his name, as a good bill, to blow it up, by the testimony of bis own breath; by swearing that he had indorsed it for something less than its value, which would taint it of usury. Thus by his own oath, he was permitted to cut down a note in the hands of a third person, which be had indorsed and put in circulation as a good one. The courts of Nisi Prius were immediately distracted with discord and disseniions, which continued to rage in them, for four years, until 1798, when, in the case of Jourdaine v. Lashbrook, 7 Ter. Rep. 601, the question was brought up in form, to the King’s Bench, and Lord Kenyon carried a majority of their opinions in favor of his innovation; but he could make no impression upon the independent mind of Mr. Justice Ashhurst. About this time, that great and eminent judge, Mr. Justice Buller, left the King’s Bench, for a scat in the Common Pleas, by exchange with Mr. Justice Lawrence; whether in disgust with the versatility of the Chief Justice, is not known; but he openly and fearlessly opposed the innovation. In *240 deed, the admission of it was so slow and reluctant in England, that ten years afterward, (in 1808) is the first we hear of its reception in the Common Pleas; and then by the Chief Justice of that court, atNisiPrius, in the case of Shuttleworth v. Stevens, 1 Camp. N. P. Rep. 407.
In Lord Kenyon’s argument to support the innovation, he undertakes an enumeration of the causes which can render a witness incompetent in law, and then proceeds to shew that they do not comprehend this case; but the enumeration is a remarkably defective one, and being too narrow, perhaps on account of haste, to establish any logical conclusion on it, he resorts to a different ground. He says that a person’s name, subscribed to authenticate an instrument, does not render him incompetent to disprove and invalidate it by his oath; for it lias been solemnly settled, that the subscribing witnesses to a will, are competent to invalidate it by their testimony. Undoubtedly they are; but there is not the slightest analogy between that case and the present. Wills, which men keep by them till their death, are not negotiable instruments; nor are they made to pass from hand to hand in commerce like negotiable notes and bills of exchange, in lieu of money. The maker and indorsers of a note, are parties to the very contract they are called to invalidate; Whereas the subscribing witnesses to a will, arc no more parties to it than witnesses to the sealing and delivery of a bond, are parties' to the bond. This assumed analogy between a Will and Commercial Paper, seems not to be evident to any mind but that of Lortl Kenyon himself; and yet he makes it the main reason for his opinion; he cites no book, case, or authority, to the contrary of Walton v. Shelley; and having formerly given his unqualified approbation, in the case of Bent v. Baker, he undertakes to maintain his consistency by denying what he said in Bent v. Baker, after it had stood seven years in England, as bis official opinion.
Having viewed the disturbances arising from this innovation in England, and the distressing lengths of their continuance there, let us look at its dismal effects in our own country, which was reposing in peace and quietness under the rule in Walton v. Shelley, until the year 1794, when this apple of discord was flung among us, by the case of Jourdaine v. Lashbrook. I shall not undertake to shew the extent in which it agitated the judiciary *241 of each particular state. Suffice it to say, that the states passed from uniformity and union on this point, into a condition of absolute discord. Some of them went one way, and some the other. A merchant would recover a bill of exchange in one state, and lose it in another. It would avail him in New Hampshire, Massachusetts, Pennsylvania, North Carolina, South Carolina, and Louisiana, where they follow the conservative rule in Walton & Shelley; whereas the same bill would be invalidated in Connecticut, New York and Virginia, where they followed the destructive rule to mercantile paper, introduced by the case of Jourdaine v. Lashbrook.
Things continued in this discordant state, until the year 1834, when this great question came up for decision in the Supreme Court of the United States, Bank of the United States v. Dunn, 6 Peter’s Rep. 51. It arose on a note made by Scott to Dunn, and by Dunn indorsed to Carr, and by Carr to the Bank; on which, the Bank sued Dunn as indorser, in the Circuit Court, where the defendant was allowed to call Carr, the other indorser, as a witness, to invalidate the indorsements; and Carr swore that before either of them put their names on the paper, he understood from the president and cashier of tiie Bank, that there would be no risk in indorsing the note for Scott, because one Weightman had pledged stock to the Bank for the payment ofit; and on his communicating this information to Dunn, both of them indorsed it. On this evidence, the jury found a verdict for Dunn; but there was a bill of exceptions to the competency of Carr the indorser, as a witness; and upon error brought, this point was argued before the venerable Chief Justice Marshall, and his associates, in the Supreme Court of the nation; after which, they unanimously decided, that the law was well and rightly settled in the case of Walton v. Shelley; and that no party to anegotiable intrument, was a competent witness, by Ms testimony to invalidate it; wherefore they reversed the judgment of the Circuit court. And they affirmed this decision again, two years afterward, in another case, 8 Peter’s Rep. 12, The Bank of the Metropolis v. Jones. These decisions stand entitled to the fullest American respect, as they emanate from the highest tribunal in the nation, and one of the last resort in cases coming before it; more especially in relation to negotiable notes and bills of exchange *242 which concern the commerce of the union. I presume the judiciary of no State, will set up cases from a foreign court, to overthrow the adjudications of this tribunal, which is the only one that can assure to the Union, a uniform rule. They guided me on the trial of this cause; and I still consider them paramount evidence of the common law. They are of high authority; and the reasons they stand upon, arc public policy, the safety of trade, the security of mercantile paper, and the prevention of fraud, conspiring to shew that an indorser is not a competent witness to invalidate an indorsement put into circulation by himself, on the credit of his name; that his testimony was properly rejected; and that a new trial ought not to be granted.
But I cannot close my remarks in this case, without noticing the disastrous effects of Lord Kenyon’s decision, on the business paper of England, nor the tremendous means for its security, to which the British parliament was compelled to resort.
Usury is a secret agreement between the parties, never appearing upon the face of the note or its indorsements, and so long as the parties are not competent witnesses to invalidate the paper, by swearing to the usury, third persons receiving it bona fide in trade, were exposed to little or no danger. But when the parties became competent witnesses of their own illegalities, under this great innovation, it was easy to connect a few shillings of usury with a note, and put it in circulation by indorsement as a good one. If either of them was sued on it at-maturity, he had only to call the other for a witness, and he would blow it up in-the hands of the holder, for usury. As Buller, Justice said, it enabled any two men, by conspiring together, to cheat the world. And as no confidence could be placed in business paper, after this innovation, the British parliament had to repeal the statute of usury, so far as to enact, that no note or bill of exchange should be void for usury, in the hands of an innocent holder. And now the most merciless usurer, lending money at the rate’ of fifty per cent per annum, and taking a note for it, can legalize that note immediately, by indorsing it away and receiving full value for it. This statute may be called an act to legalize usury in Eng-gland, and is the unblest fruit there, of Lord Kenyon’s innovation.
The fruit it produced in the state of New York is well known. *243 Cash is very seldom paid down in the transactions of commerce: the universal substitutes for it, are bills, notes and acceptances at 30, 60 and 90 days, which are afterward indorsed from hand to hand in trade, until they become due, the more names being on them the greater their credit. A general distrust of its validity, occasions a disturbance of trade, that excites universal sensation and alarm. The judiciary of New York, soon perceived how easily the general holders of this paper might be defrauded, if the very parties after putting it in circulation and making it subserve all their own purposes, could then turn round and become witnesses of some latent fact, to destroy it in the hands of others; therefore they soon, and very wisely, returned back to the conservative rule in Walton v. Shelley; not indeed by refusing to let parties become witnesses, but by making their testimony of no avail; for they decided that a valid business-note might be bought, sold, and transferred by indorsement, at a greater discount than seven per cent for the time it had to run, and the agreement, though proved, would not be usurious. And this doctrine has since, and is now, fully supported and maintained in the Supreme Court of New York, Braman v. Hess, 13 Johns. 52; Munn v. The Commission Co. 15 John’s. Rep. 44; Powel v. Waters, 17 Johns. 176; Kent v. Walton, 7 Wend. 256; and in the Supreme Court of the United States, Nichols v. Fearson, 7 Peter’s Rep. 103. Possibly it may not accord with some ultra decisions in the English courts, but that is of little moment, if it neither disturbs the statute of usury, nor any principio of the common law; and I conceive it does neither.
By the statute of usury, no person shall take above the rate of six per cent per annum “for loan of any money.” It does not define what shall be a loan of money; it leaves the law to determine that. Some English cases seem to hold that buying a valid note in market and paying for it one hundred dollars for example, taking the seller’s indorsement on it, is a loan to him of the hundred dollars; whereas, according to the decisions in New York, and in the Supreme Court of the United States, it is not money loaned, it is purchase money paid for the note; the indorsement only transferring to the purchaser, that right of calling on the other parties for payment, which the seller himself had. It is true that the indorsement amounts to the draw *244 ing of a new bill, ánd subjects the indorser to liabilities; but he can be liable to the purchaser for no more than the purchaser gave him for the note, and may shew the consideration, because he and the purchaser are the original parties to this newly drawn bill, and all that the purchaser can recover from him, on an implied promise, is a return of the purchase money with lawful interest. So that there is not a shadow of usury between them, to taint the sale of the note. That the consideration of a note or indorsement may be shown in an action between the original parties to it, is so familiar as not to need citation of cases; yet I refer to Livingston v. Hastie, 2 Caines, 248; 13 Johns. 52; and the collection in 2 Wheeler, 216, A. 18. If it be true that the seller’s indorsement may render him liable to the purchaser’s indorsee, it will result from the law merchant, not from any usury between him and the purchaser: and if the contract between him and the purchaser be not usurious, how can it possibly affect a note which is in other respects pure? If a negotiation for a loan can be proved, and that the sale was only a cover for it, the transaction will be usurious, as where a note is made with accommodation indorsers, for the purpose of raising money, and this known to the purchaser, it is then no sale; it is a covered loan. So there is no incongruity between this doctrine and any principle of the common law, nor any thing in it to disturb the statute of usury.
If an indoi’ser is not competent, by his testimony, to invalidate a note put in circulation by himself, the verdict in this case is right: or if every thing which was offerred to be proved by him, admitting it to be all true, was not sufficient in law, to invalidate the note, the verdict is still right. Taking the case either way, there is no ground for a new trial, and the rule to shew cause ought to be discharged.
JVew trial granted,
*244 a. The following brief of J. W. Miller, Esq., was received too late for insertion in its proper place, at page 193.'
Against the rule, the plaintiff’s counsel contended,
1st, That a party to negotiable paper, is an incompetent witness to prove it void at the time he put his name upon it: and cited. 1 Term. 296; 3 Term. 27; 5 Term. 578; 1 Esp. Rep. 298, 176; Peake’s N. P. 52, 117; 3 John. Cases, 185; 2 John. Rep. 165; 1 Caine’s Rep. 258; 14 Johns. Rep. 270; 15 Johns. Rep. 270; 17 John. Rep. 176; 18 John. Rep. 167; 6 Cowen Rep. 484; 8 Cowen Rep. 669; 2 Dal. 194, 239, 242; 2 Binn. 154; 2 Yeates, 17; 3 Mass. Rep. 27, 565; 4 Mass. 156; 6 Mass. 449; 7 Mass. 199, 480; 10 Mass. 502; 17 Mass. 96, 122; 2 Dess. S. C. Rep. 224; 2 Bay, 93; Martin’s Lou. Rep. 18; Swift’s Law of Ev. 95 to 105; 6 Peters’ U. S. 51; 8 Peters’ U. S. 12; Penn. Rep. 791.
2d, That the discounting of a note bonafide‘ms.áe and in market, for more than six per cent., is not usurious, it is a sale and not a contract for the loan of money. 3 Eng. Law Rep. 95, 97, 98; Chitty on Bills, 76, 77; 4 East Rep. 55; 1 Esp. Rep. 274; 7 Peters’ Rep. 103, 110; 4 Peters’ Rep. 205; 15 Johns. Rep. 44, 45; 2 Johns. Cases, 60; 2 Term. Rep. 52; 3 Nels. 256; 3 Bos. & Pul. 158; 8 Cowen, 685, 706; 17 John. Rep. 176; 1 Saund. Rep. 295; 1 East, 92; 9 East, 141, 191.
Mote to the Binder. This page is to face page 244.